**IN THE SUPREME COURT, STATE OF WYOMING**

**2017 WY 25**

**OCTOBER TERM, A.D. 2016**

**March 7, 2017**

AN INQUIRY CONCERNING THE
HONORABLE RUTH NEELY,
MUNICIPAL COURT JUDGE AND
CIRCUIT COURT MAGISTRATE,
NINTH JUDICIAL DISTRICT,
PINEDALE, SUBLETTE COUNTY,
WYOMING

JUDGE RUTH NEELY

(Petitioner),

v.                                                          J-16-0001

WYOMING COMMISSION ON
JUDICIAL CONDUCT AND ETHICS

(Respondent).

*Original Proceeding*
*Petition on Professional Regulation*
*Wyoming Commission on Judicial Conduct and Ethics*

*Representing Petitioner:*
    Herbert K. Doby, Torrington, Wyoming; James A. Campbell, Kenneth J.
    Connelly, and Douglas G. Wardlow of Alliance Defending Freedom, Scottsdale,
    Arizona. Argument by Mr. Campbell.

*Representing Respondent:*
    Patrick Dixon and Britney F. Turner of Dixon & Dixon, LLP, Casper, Wyoming;
    Timothy K. Newcomb, Laramie, Wyoming. Argument by Mr. Dixon.

*Representing Amici Curiae Mayor and Town Council Members of the Town of*
*Pinedale and Sutherland Institute Center for Family & Society:*
    William H. Twichell, Pinedale, Wyoming.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

*FOX, Justice, delivers the opinion of the Court; KAUTZ, Justice, files a dissenting opinion, in which DAVIS, Justice, joins.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]    Judge Ruth Neely objects to the Wyoming Commission on Judicial Conduct and Ethics' (Commission) recommendation that she be removed from her positions as municipal court judge and part-time circuit court magistrate because of her refusal to perform same-sex marriages in her judicial capacity as a part-time circuit court magistrate.  We conclude, as have all the state judicial ethics commissions that have considered this question, that a judge who will perform marriages only for opposite-sex couples violates the Code of Judicial Conduct, and we hold that Judge Neely violated Rules 1.2, 2.2, and 2.3 of the Wyoming Code of Judicial Conduct.  However, we do not accept the Commission's recommendation for removal, and instead order public censure, with specific conditions.

## ISSUES

[¶2]    While the parties state numerous and divergent issues, we consider the issues in this case to be:

1.    Does the United States Constitution permit this Court to discipline Judge Neely for announcing that her religious beliefs prevent her from officiating same-sex marriages?

2.    Does the Wyoming Constitution permit this Court to discipline Judge Neely for announcing that her religious beliefs prevent her from officiating same-sex marriages?

3.    Are the provisions of the Wyoming Code of Judicial Conduct alleged to have been violated by Judge Neely void for vagueness?

4.    Did Judge Neely violate the Wyoming Code of Judicial Conduct?

[¶3]    This case is ***not*** about same-sex marriage or the reasonableness of religious beliefs.  We recognize that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here." *Obergefell v. Hodges*, 135 S.Ct. 2584, 2602, 192 L.Ed.2d 609 (2015).  This case is also not about imposing a religious test on judges.  Rather, it is about maintaining the public's faith in an independent and impartial judiciary that conducts its judicial functions according to the rule of law, independent of outside influences, including religion, and without regard to whether a law is popular or unpopular.

1

## FACTS

[¶4]    Judge Neely was appointed as a municipal court judge for the Town of Pinedale, Wyoming, in 1994, and has served continuously in that capacity ever since.[1]  As a Pinedale municipal court judge, Judge Neely hears all cases arising from the town's ordinances, such as traffic and parking violations, animal control, public intoxication, underage drinking, breach of peace, nuisances, and similar matters.  Municipal court judges are not authorized to perform marriages.  Wyo. Stat. Ann. § 20-1-106(a) (LexisNexis 2015).  Municipal court judges are appointed by the governing bodies of the towns where they sit.  Wyo. Stat. Ann. § 15-4-202(d) (LexisNexis 2015).  It is undisputed that the Wyoming Code of Judicial Conduct applies to them, and that they are subject to the disciplinary authority of the Commission on Judicial Conduct and Ethics and this Court.  Wyoming Code of Judicial Conduct, *Application* I.(B); *see also* Wyo. Const. art. 5, § 6.  The evidence is uncontroverted that Judge Neely is highly respected as a municipal court judge in her community, including by at least one member of the gay community.

[¶5]    Since approximately 2001, Judge Neely has also served as a part-time circuit court magistrate; she was most recently appointed by circuit court Judge Haws to assist him. Part-time magistrates are in a unique position in that they perform judicial functions only as needed.  They are not on the state payroll, but instead are compensated for particular services by voucher.  Wyo. Stat. Ann. § 5-9-213 (LexisNexis 2015).  One of her powers in that capacity is to perform marriage ceremonies, Wyo. Stat. Ann. § 5-9-212(a)(iii) (LexisNexis 2015), and in fact performing marriages was her primary function as a part-time circuit court magistrate.  Judge Neely was compensated for marriages by the marrying couple and not by the state.  Under Wyoming law, marriage is "a civil contract . . . ."  Wyo. Stat. Ann. § 20-1-101 (LexisNexis 2015).  Marriage ceremonies have minimal requirements:

> In the solemnization of marriage no particular form is required, except that the parties shall solemnly declare in the presence of the person performing the ceremony and at least two (2) attending witnesses that they take each other as husband and wife.

Wyo. Stat. Ann. § 20-1-106(b) (LexisNexis 2015).

[¶6]    Judge Neely has performed over 100 weddings.  Part-time magistrates can and do decline to perform marriages for various reasons.  Stephen Smith, who also serves as a part-time circuit court magistrate, testified that he only performs marriages for people he

---

[1] Judge Neely is not a lawyer and has no formal legal training.

2

knows.  Judge Haws testified that he would turn down a request to perform a marriage if his schedule would not permit it, and that it would be acceptable for magistrates to turn down such a request if they were going to a football game, getting their hair done, or were sick.

[¶7]    When she was appointed as part-time circuit court magistrate, Judge Neely took the oath required by Wyoming law.

> "I do solemnly swear (or affirm) that I will support, obey and defend the constitution of the United States, and the constitution of the state of Wyoming; that I have not knowingly violated any law related to my election or appointment, or caused it to be done by others; and that I will discharge the duties of my office with fidelity."

Wyo. Const. art. 6, § 20.[2]

[¶8]    Judge Neely is a devout Christian and a member of the Lutheran Church, Missouri Synod.  It is undisputed that she holds the sincere belief that marriage is the union of one man and one woman.  Shortly after the United States District Court for the District of Wyoming issued its order enjoining the state from enforcing or applying any "state law, policy, or practice, as a basis to deny marriage to same-sex couples," *Guzzo v. Mead*, No. 14-CV-200-SWS, 2014 WL 5317797, at *9 (D. Wyo. Oct. 17, 2014),[3] Judge Neely met with Judge Haws "to explain to him that I would not be able to officiate same-sex marriages due to my sincerely held religious beliefs about what marriage is."  Judge Haws advised her to "keep your head down and your mouth shut," until they received further guidance.

[¶9]    On December 5, 2014, *Pinedale Roundup* reporter Ned Donovan called Judge Neely on her cell phone.  She returned the call, Mr. Donovan answered "Pinedale Roundup," and he then asked her if she was "excited" to be able to perform same-sex marriages.  In the article that followed the interview, two quotes were attributed to Judge Neely, which she later testified were accurate:

> "I will not be able to do them. . . .  We have at least one magistrate who will do same-sex marriages, but I will not be able to."

---

[2] This oath is required of circuit court magistrates by Wyo. Stat. Ann. § 5-9-203 (LexisNexis 2015).
[3] That decision, essentially finding that same-sex marriage was legal in Wyoming, was established as the law of the land by the United States Supreme Court in *Obergefell v. Hodges*, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015).

"When law and religion conflict, choices have to be made. I have not yet been asked to perform a same-sex marriage."

[¶10] Mr. Donovan's article appeared in the December 9, 2014 edition of the *Pinedale Roundup*. The *Sublette Examiner* published the article in its online edition on December 11, 2014. The matter came to the Commission's attention, and on December 22, 2014, the Commission's Executive Director forwarded the articles to the Commission's Investigatory Panel for their review. On January 6, 2015, the Investigatory Panel decided to commence an investigation and sent a letter of inquiry to Judge Haws and Judge Neely.

[¶11] Also on January 6, without knowledge of the Commission's actions, Judge Neely sent a letter to the Judicial Ethics Advisory Committee to seek its guidance. She asked: "Can a magistrate recuse himself/herself from officiating at a same sex wedding due to religious conviction; and if so, without fear of civil rights repercussions?" She explained:

Without getting in too deeply here, homosexuality is a named sin in the Bible, as are drunkenness, thievery, lying, and the like. I can no more officiate at a same sex wedding than I can buy beer for the alcoholic or aid in another person's deceit. I cannot knowingly be complicit in another's sin. Does that mean I cannot be impartial on the bench when that homosexual or habitual liar or thief comes before me with a speeding ticket? Or the alcoholic appears before me for yet another charge of public intoxication? No. Firmly, no. I have been the municipal court judge for the Town of Pinedale for over 20 years; and there has not been one claim of bias or prejudice made by anyone who has come before me. Not the homosexual, not the alcoholic, not the liar, not the thief. Not one.[4]

The Commission provided no answer to Judge Neely's question, explaining that it could only "provide guidance for those judges seeking resolution to *current or unresolved* ethical dilemmas, rather than to confirm a judge's decision or provide a legal opinion." On January 15, 2015, Judge Haws met with Judge Neely and suspended her from her position as a part-time circuit court magistrate.

---

[4] This letter to the Judicial Ethics Advisory Committee would normally be a protected communication. However, this Court's "determination must be made upon the evidence that was presented to the Board at the hearing." *Bd. of Prof'l Responsibility v. Custis*, 2015 WY 59, ¶ 19, 348 P.3d 823, 829 (Wyo. 2015) (citations omitted). As no party raised this issue either below or on appeal, and in fact both parties referred to the letter, it remains part of the record, particularly when Judge Neely waived confidentiality when she filed her motion to remove confidentiality. *See infra* ¶ 14.

4

[¶12] In her response to the Investigatory Panel's inquiry, Judge Neely affirmed that "[m]y conscience, formed by my religious convictions, will not allow me to solemnize the marriage of two men or two women . . . ." She indicated that she has not been asked to perform a same-sex marriage, and she admonished the Commission:

> [P]lease keep my and others' First Amendment rights in mind. I want to continue to officiate at weddings; and I should not have to fear that lawful exercise of my freedom of religion as a member of a Lutheran church in Pinedale, Wyoming would be a violation of the Code.

[¶13] After reviewing the responses from Judge Neely and Judge Haws, the Investigatory Panel met again and determined there was probable cause to find a code violation and referred the matter to the Commission's Adjudicatory Panel. The Commission and Judge Neely retained counsel, and the parties engaged in discovery and filed cross-motions for summary judgment. The Adjudicatory Panel held a hearing on those motions and issued its Order Granting Commission's Motion for Partial Summary Judgment and Denying Judge Neely's Motion for Summary Judgment on December 31, 2015. The full Commission adopted the Adjudicatory Panel's findings and recommendations, and recommended that Judge Neely be removed from her positions as municipal court judge and part-time circuit court magistrate.

[¶14] Judge Neely timely petitioned this Court to reject the Commission's recommendation, the parties filed their briefs, and this Court heard the arguments of counsel. Although normally all proceedings before the Commission are confidential (Rules Governing the Commission on Judicial Conduct and Ethics, Rule 22), Judge Neely filed a motion seeking to remove the confidentiality, the motion was not opposed by the Commission, and it was granted by this Court. Several motions to file *Amicus Curiae* briefs were filed, and this Court denied all but the Motion for Leave to File Proposed Brief of *Amici Curiae* Mayor and Town Council Members of the Town of Pinedale and Sutherland Institute Center for Family & Society in Support of the Honorable Ruth Neely's Petition Objecting to the Commission's Recommendation, which was granted.

### DISCUSSION

[¶15] Judge Neely contends that removing[5] her from either judicial position "because of her religious beliefs" would violate her constitutional rights to free speech and free exercise of religion, under both the United States and the Wyoming constitutions. Judge

---

[5] As we discuss below, *see infra* ¶ 57, this Court is not bound by the Commission's recommendation, and although we have determined that discipline is appropriate, we stop short of removing her from either of her judicial positions.

Neely's religious beliefs, however, are not the issue. Rather, the issue is Judge Neely's conduct as a judge.

### I. Does the United States Constitution permit this Court to discipline Judge Neely for announcing that her religious beliefs prevent her from officiating same-sex marriages?

[¶16] The free exercise clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. This provision is made applicable to the states by the Fourteenth Amendment. *Cantwell v. State of Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990).[6] Yet the United States Supreme Court has recognized an important distinction between the "freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Cantwell*, 310 U.S. at 303-04, 60 S.Ct. at 903.

[¶17] In *Smith*, the United States Supreme Court considered the free exercise claims of two parties whose employment had been terminated for their use of peyote for religious purposes, and then were denied unemployment benefits. 494 U.S. at 874, 110 S.Ct. at 1598-99. The Court rejected respondents' claims that "their religious motivation for using peyote places them beyond the reach of a criminal law that is not specifically directed at their religious practices . . . ," *Id.* at 878, 110 S.Ct. at 1599, citing the principle that a citizen cannot excuse violation of the law because of his religious beliefs. "'Laws,' we said, 'are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. . . .'" *Id.* at 879, 110 S.Ct. at 1600 (quoting *Reynolds v. United States*, 98 U.S. 145, 166-67, 25 L.Ed. 244 (1878)).

> Subsequent decisions have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'

*Smith*, 494 U.S. at 879, 110 S.Ct. at 1600 (citations omitted).

---

[6] Although Congress subsequently attempted to overturn *Smith* by enacting the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 20000bb, the United States Supreme Court struck down the Act, as applied to state actions, in *City of Boerne v. Flores*, 521 U.S. 507, 536, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997).

[¶18] We adhere to the *Smith* Court's rule on the interplay between the right to free exercise and the obligation to comply with a valid and neutral law, but unlike the *Smith* Court, we will apply strict scrutiny to our analysis. The parties agree that we should do so, and Judge Neely has raised both free exercise of religion and freedom of speech claims, requiring us to apply the strict scrutiny standard to our decision. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 774, 122 S.Ct. 2528, 2534, 153 L.Ed.2d 694 (2002) (applying strict scrutiny in First Amendment challenge to rule restricting judicial campaign speech). Strict scrutiny requires us to determine whether disciplining Judge Neely for her refusal to conduct same-sex marriages serves a compelling state interest, and whether the discipline is narrowly tailored to serve that interest. *Williams-Yulee v. Florida Bar*, --- U.S. ---, ---, 135 S.Ct. 1656, 1664-65, 191 L.Ed.2d 570 (2015).

[¶19] The judicial code at issue in *Williams-Yulee* prohibited candidates for judicial election from "personally solicit[ing] campaign funds, or solicit[ing] attorneys for publicly stated support . . . ." 135 S.Ct. at 1663 (citation omitted). Williams-Yulee (Yulee), who ran for a seat on a county court, drafted a campaign letter soliciting campaign contributions, which she mailed to local voters and posted on her campaign website. *Id.* The Florida bar filed a complaint against Yulee for violating the Florida Code of Judicial Conduct, and the Florida Supreme Court, finding that Canon 7C was narrowly tailored to serve a compelling state interest, imposed sanctions on Yulee for her code violation. *Id.* at 1664.

[¶20] The *Williams-Yulee* Court agreed that the State of Florida had a "compelling interest in preserving public confidence in the integrity of the judiciary . . . ." *Id.* at 1666.

> The importance of public confidence in the integrity of judges stems from the place of the judiciary in the government. Unlike the executive or the legislature, the judiciary "has no influence over either the sword or the purse; . . . neither force nor will but merely judgment." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (capitalization altered). The judiciary's authority therefore depends in large measure on the public's willingness to respect and follow its decisions. As Justice Frankfurter once put it for the Court, "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

*Id. See also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009) ("Judicial integrity is . . . a state interest of the highest order." (citation omitted)). We find that, like the State of Florida, the State of Wyoming has a compelling government interest in maintaining the integrity of the judiciary, in this case by enforcing Wyoming Rules of Judicial Conduct 1.2, 2.2, and 2.3.

[¶21]   Judge Neely contends that *Republican Party of Minnesota v. White* governs, and there is no compelling state interest in ensuring her lack of preconception on the issue of same-sex marriage.  536 U.S. at 777-78, 122 S.Ct. at 2536.  In *White*, the United States Supreme Court addressed a different rule, restricting judicial campaign activity.[7]  The Court there had before it the "announce clause," which said that a candidate for judicial office in Minnesota shall not "announce his or her views on disputed legal or political issues."  *Id*., 536 U.S. at 770, 122 S.Ct. at 2532.  (The "announce clause" is distinguished from a separate provision which "prohibits judicial candidates from making 'pledges or promises of conduct other than the faithful and impartial performance of the duties of the office.'" (internal citation omitted)).

[¶22]   In *White*, a candidate for judicial office had distributed campaign literature criticizing "Minnesota Supreme Court decisions on issues such as crime, welfare, and abortion."  *Id.* at 768, 122 S.Ct. at 2531.  Although a complaint was filed against him, the disciplinary board with the responsibility to investigate ethical violations dismissed the complaint, expressing doubt whether the announce clause was constitutionally enforceable.  *Id.* at 769, 122 S.Ct. at 2531.  The candidate, who had nevertheless withdrawn from the race, filed suit, joined by the Republican Party of Minnesota and others, seeking a declaration that the announce clause violated the First Amendment.  The board interpreted the announce clause to allow the candidate to criticize decisions of the state supreme court on such issues as application of the exclusionary rule in criminal cases, striking down a state law restricting welfare benefits, and financing abortions for poor women, but not if the candidate also stated he was against *stare decisis*.  *Id.* at 771-72, 122 S.Ct. at 2533.

[¶23]   The Court found that, although judicial impartiality may be a compelling state interest, the announce clause was not narrowly tailored to serve that interest.  *Id.* at 774-76, 122 S.Ct. at 2534-35.  The *White* majority reached this conclusion by first defining "impartiality" as "the lack of bias for or against either *party* to the proceeding.  Impartiality in this sense assures equal application of the law."  *Id.* at 775-76, 122 S.Ct. at

---

[7] Most cases dealing with the tension between the First Amendment and restrictions on judicial conduct arise in the context of judicial election campaigns.  *See Winter v. Wolnitzek*, 834 F.3d 681, 2016 WL 4446081 (6th Cir. Aug. 24, 2016); *In re Judicial Campaign Complaint Against O'Toole*, 24 N.E.3d 1114 (Ohio 2014).  Judges in Wyoming are not elected, but rather are selected in a modified system of judicial selection known as "Merit Selection" or the "Missouri Plan."  "[T]he very practice of electing judges undermines" the interest in an impartial judiciary.  Judges subject to regular elections "are likely to feel that they have at least some personal stake in the outcome of every publicized case."  And, because campaigns cost money, judges must engage in fundraising, which "may leave judges feeling indebted to certain parties or interest groups."  *White*, 536 U.S. at 788-90, 122 S.Ct. at 2542 (O'Connor, J., concurring).  "Legislative and executive officials act on behalf of the voters who placed them in office; judge[s] represent[] the Law."  *Id.* at 803, 122 S.Ct. at 2550 (Ginsburg, J., dissenting) (internal quotation marks and citation omitted).

8

2535 (emphasis in original). The Court then reasoned that the announce clause failed to address the objective of judicial impartiality because it "does not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*." *Id.* at 776, 122 S.Ct. at 2535 (emphasis in original).

[¶24] There are two critical differences between *White* and Judge Neely's case. First, rather than simply express her views on a matter of law or religion, she has stated her position that she will not perform her judicial functions with impartiality. She does not merely believe that homosexuality is a sin; as a judge, she will manifest that belief by not treating homosexual persons the same way she treats heterosexual persons. Thus, unlike the candidate in *White*, Judge Neely's conduct is at odds with a "lack of bias for or against either *party* . . . ." *Id.* at 775, 122 S.Ct. at 2535. She refuses "equal application of the law" to homosexuals. *Id*. at 776, 122 S.Ct. at 2535. Second, the rules she has violated are far more well established than the announce clause at issue in *White*. Rule 1.2, Promoting Confidence in the Judiciary; Rule 2.2, Impartiality and Fairness; and Rule 2.3, Bias, Prejudice, and Harassment, all address different facets of the fundamental requirement that judges maintain public confidence in the judiciary by impartially applying the law. *See infra* ¶¶ 59-70. The Wyoming Code of Judicial Conduct, including the three rules at issue here, is based on the American Bar Association Model Code of Judicial Conduct, as revised in 2007. Arthur Garwin et al., *Annotated Model Code of Judicial Conduct*, at 22, 30, 92, 111 (2d ed. 2011). Each of the rules at issue here has been applied in numerous decisions. *Id.* at 31-73, 93-111, 113-119.

> When [a judge] takes the oath of office, he or she yields the prerogative of executing the responsibilities of the office on any basis other than the fair and impartial and competent application of the law to the facts. The preservation of the rule of law as our last best hope for the just ordering of our society requires nothing less than an insistence by this Court that our justice court judges be in fact what they are in name: judges.

*In re Bailey*, 541 So.2d 1036, 1039 (Miss. 1989) (emphasis omitted).

[¶25] The *White* Court went on to look at other possible grounds for finding a compelling state interest, and it rejected the argument that avoiding preconception on a particular legal view was a compelling state interest, in part because "it is virtually impossible to find a judge who does not have preconceptions about the law." 536 U.S. at 777, 122 S.Ct. at 2536. It similarly rejected the notion that there was a compelling state interest in maintaining judicial open-mindedness regarding the law, stating, for example, that Minnesota's prohibition of a judicial candidate's statement, "I think it is constitutional for the legislature to prohibit same-sex marriages," was "woefully underinclusive" because the same person could make that statement prior to announcing his candidacy, and after he is elected. *Id.* at 779-80, 122 S.Ct. at 2537. (*White* was decided before *Obergefell*.)

9

[¶26] Judge Neely attempts to fit her conduct into the "lack of preconception" prong discussed in *White*. 536 U.S. at 766, 122 S.Ct. at 2530. But we are not concerned here with Judge Neely's views on the issue of same-sex marriage. Instead, the questions that Judge Neely's conduct engender regarding her judicial impartiality go to her bias toward particular *parties*, rather than toward particular *issues*. Judge Neely has indicated that she will perform marriage ceremonies for one category of parties, but not another. Her position is a sufficient basis for the public's confidence in Judge Neely's impartiality to be undermined, and thus enforcement of the Code of Judicial Conduct serves a compelling state interest under these facts. Although Judge Neely contends that this result would mean that "no one who holds Judge Neely's widely shared beliefs about marriage can remain a judge in Wyoming," that is incorrect. Judge Neely may hold her religious beliefs, and she must impartially apply the law regardless of those beliefs.

[¶27] It is quite likely that all judges disagree with some aspect of the law for religious, personal, or moral reasons. Yet the judiciary plays a key role in preserving the principles of justice and the rule of law, which requires the consistent application of the law regardless of the judge's personal views. "Although each judge comes to the bench with a unique background and personal philosophy, a judge must interpret and apply the law without regard to whether the judge approves or disapproves of the law in question." Wyoming Code of Judicial Conduct, Rule 2.2, Comment 2. "Our obligation is to define the liberty of all, not to mandate our own moral code." *Planned Parenthood of Southeastern Pennsylvania. v. Casey*, 505 U.S. 833, 850, 112 S.Ct. 2791, 2806, 120 L.Ed.2d 674 (1992). An independent judiciary "requires that judges decide cases according to the law and the facts, without regard to whether" a particular law is popular, and without permitting a judge's "other interests or relationships to influence the judge's judicial conduct or judgment." Wyoming Code of Judicial Conduct, Rule 2.4(B) and Comment. "No judge is permitted to substitute his concept of what the law ought to be for what the law actually is." *In re Inquiry Concerning a Judge, J.Q.C. No. 77-16*, 357 So.2d 172, 179 (Fla. 1978). We find that the state has a compelling interest in maintaining public confidence in the judiciary by enforcing the rules requiring independence and impartiality.

[¶28] We turn next to the narrowly-tailored prong of strict scrutiny. The *Williams-Yulee* Court explained that "narrowly tailored" does not mean "perfectly tailored."

> The impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary. . . . Here, Florida has concluded that all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary; banning all personal solicitations by judicial candidates is narrowly tailored to address that concern.

*Williams-Yulee*, 135 S.Ct. at 1671.

10

[¶29] Judge Neely argues that "removing [her] for her religious beliefs and expression about marriage is fatally underinclusive," and therefore not narrowly tailored. In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the United States Supreme Court found that the challenged ordinances were not narrowly tailored because they were underinclusive to the city's professed governmental interest in protecting the public health and preventing cruelty to animals. The ordinances, while prohibiting the Church of Lukumi's animal sacrifice, permitted many other types of animal deaths, like euthanasia of unwanted animals. *Id.*, 508 U.S. at 543, 113 S.Ct. at 2232. Judge Neely attempts to draw parallels to her circumstances, arguing that a municipal court judge "may critique or praise . . . the *Guzzo* decision that brought same-sex marriage to Wyoming" or could "publicly disclose their views on controversial political issues" in a caucus-type election procedure. Judge Neely again mischaracterizes her conduct at issue. She is not subject to discipline merely because she has expressed her religious beliefs. She has gone one or two critical steps farther than that to say that she will not impartially perform her judicial functions with respect to parties the United States Supreme Court has held have a constitutional right to be treated equally. *Obergefell*, 135 S.Ct. at 2598, 2602 (due process clause and equal protection clauses of the Fourteenth Amendment guarantee same-sex couples the right to marry).

[¶30] Judge Neely further argues that disciplining her would violate her free speech rights because the Commission would not have brought a disciplinary proceeding against a judge who expressed her willingness to follow the law on same-sex marriage, and therefore it is discriminating against her based on the content and viewpoint of her speech. But there would indeed be no basis for disciplining a judge who indicated her willingness to follow the law and thus demonstrated her impartiality toward parties. The action against Judge Neely is a response to her deeds, not her faith.

[¶31] Judge Neely argues that others could perform marriages for same-sex couples, causing no disruption to their rights to marry, and the dissent relies heavily on the fact that same-sex couples will likely face no obstacles to getting married despite Judge Neely's refusal to perform their marriages. These contentions may be true, but they have no relevance to the decision whether she has violated any provision of the Code of Judicial Conduct. Even if we accepted the premise that allowing Judge Neely to opt out would have no effect on the rights of same-sex couples to marry,[8] the problem of the public's faith in judicial integrity remains. As Judge Posner explained in the context of a case decided under the Civil Rights Act of 1964, §§ 701(j), 703(a)(1), 42 U.S.C.A. §§ 2000e(j), 2000e-2(a)(1):

---

[8] "There cannot be one set of employees to serve the preferred couples and another who is 'willing' to serve LGBT citizens with a 'clear conscience' . . . ." *Barber v. Bryant*, Nos. 3:16-CV-417 & 442-CWR-LRA, 2016 WL 3562647, at *23 (S.D. Miss. June 30, 2016).

11

Mr. Rodriguez, a Chicago police officer, claims, I have no reason to doubt sincerely, that it violates his religious principles to guard abortion clinics. He is entitled to his view. He is not entitled to demand that his police duties be altered to conform to his view any more than a volunteer member of the armed forces is entitled to demand that he be excused from performing military duties that conflict with his religious faith . . . or than a firefighter is entitled to demand that he be entitled to refuse to fight fires in the places of worship of religious sects that he regards as Satanic. The objection to recusal in all of these cases is not the inconvenience to the police department, the armed forces, or the fire department, as the case may be, though that might be considerable in some instances. ***The objection is to the loss of public confidence in governmental protective services if the public knows that its protectors are at liberty to pick and choose whom to protect.***

The public knows that its protectors have a private agenda; everyone does. But it would like to think that they leave that agenda at home when they are on duty—that Jewish policemen protect neo-Nazi demonstrators, that Roman Catholic policemen protect abortion clinics, that Black Muslim policemen protect Christians and Jews, that fundamentalist Christian policemen protect noisy atheists and white-hating Rastafarians, that Mormon policemen protect Scientologists, and that Greek-Orthodox policemen of Serbian ethnicity protect Roman Catholic Croats. We judges certainly want to think that U.S. Marshals protect us from assaults and threats without regard to whether, for example, we vote for or against the pro-life position in abortion cases.

*Rodriguez v. City of Chicago*, 156 F.3d 771, 779 (7th Cir. 1998) (Posner, C.J., concurring) (emphasis added). In *Endres v. Indiana State Police*, 349 F.3d 922, 926 (7th Cir. 2003), the Seventh Circuit upheld the termination of a state police officer who would not defend a casino because it would violate his religious beliefs, emphasizing

the need to hold police officers to their promise to enforce the law without favoritism—***as judges take an oath to enforce all laws, without regard to their (or the litigants') social, political, or religious beliefs.*** Firefighters must extinguish all fires, even those in places of worship that the firefighter regards as heretical. Just so with police.

*Id.* at 927 (emphasis added).

[¶32] Allowing Judge Neely to opt out of same-sex marriages is contrary to the compelling state interest in maintaining an independent and impartial judiciary. Judge Neely, like all judges, has taken an oath to enforce all laws, and the public depends upon an impartial judiciary, regardless of religious sentiment. "The objection is to the loss of public confidence in [the judiciary] if the public knows that its [judges] are at liberty to pick and choose whom to [serve]." *Rodriguez*, 156 F.3d at 779.

[¶33] "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen v. Roy*, 476 U.S. 693, 699, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986). In *Bowen*, parents claimed that the government's requirement that they provide a social security number for their child in order to receive government benefits violated their sincerely held religious beliefs that the number would "rob the spirit" of their daughter. *Id.* at 696, 106 S.Ct. at 2150. The Court distinguished between beliefs and conduct, finding that the parents' issue implicated conduct and therefore was not entitled to absolute protection under the First Amendment. *Id.* at 699, 106 S.Ct. at 2152. It rejected the parents' claim, holding that "[t]he Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.* at 700, 106 S.Ct. at 2152.

[¶34] *Amici Curiae* point out that in many cases, courts have required accommodation for religious beliefs. For instance, in *American Postal Workers Union, San Francisco Local v. Postmaster General*, 781 F.2d 772, 776 (9th Cir. 1986), the court held that Title VII of the Civil Rights Act of 1964 required the post office to determine reasonable accommodations for postal workers who believed that processing draft registration forms was contrary to their religious beliefs. But there, unlike in *Rodriguez* and *Endres*, there was no issue of public confidence in the neutrality of the clerks processing draft registrations. *Amici Curiae* also cite *Haring v. Blumenthal*, 471 F.Supp. 1172 (D.C. Cir. 1979), another Title VII case in which the court held that the Internal Revenue Service was required to allow its employee to disqualify himself from handling applications for exemptions from groups whose practices were abhorrent to his religious beliefs. There, the court rejected the argument that the integrity of the Internal Revenue Service was at stake, holding that "[i]t is difficult to see how that stand could impair taxpayer confidence in the tax system or the impartiality of the IRS." *Id.* at 1183. In contrast, in Judge Neely's case, public confidence in the judiciary is the central issue.

[¶35] Perhaps the seminal case representing government accommodation to freedom of religion is *Wisconsin v. Yoder*, 406 U.S. 205, 208, 92 S.Ct. 1526, 1529, 32 L.Ed.2d 15 (1972). In *Yoder*, the Court found unconstitutional Wisconsin's application of its compulsory school attendance law to Amish parents who believed that any education beyond eighth grade undermined their entire, religiously-focused way of life. 406 U.S. at

235-36, 92 S.Ct. 1543. The *Yoder* opinion emphasized "the interrelationship of belief with [the Amish] mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization," and how as a result compulsory high-school education would "substantially interfer[e] with the religious development of the Amish child and his integration into the way of life of the Amish faith community." *Id.* at 218, 235, 92 S.Ct. at 1534, 1543. The Court held compulsory attendance at *any* school—whether public, private, or home-based— prevented these Amish parents from making fundamental decisions regarding their children's religious upbringing and effectively overrode their ability to pass their religion on to their children, as their faith required. *Id.* at 233-35, 92 S.Ct. 1542-43.

[¶36] There are obvious distinctions between Judge Neely's case and *Yoder*. She is required by the Wyoming Code of Judicial Conduct to perform a ministerial judicial function in an impartial manner. Unlike the Amish in *Yoder*, occasionally performing this function does not threaten her very "way of life" by impacting a distinct community and life style. *Yoder* emphasized that its holding was essentially *sui generis*, as few sects could make a similar showing of a unique and demanding religious way of life that is fundamentally incompatible with *any* schooling system. *See Yoder*, 406 U.S. at 235-36, 92 S.Ct. at 1543. Judge Neely can make no such showing. Moreover, in *Yoder*, the Amish parents had been criminally convicted for violating Wisconsin's compulsory school attendance law. *Id.* at 207, 92 S.Ct. at 1529. Judge Neely is not compelled to serve as a part-time circuit court magistrate and does not face criminal prosecution.

[¶37] Neither Judge Neely nor *Amici Curiae* direct us to any case in which accommodation for religious beliefs has been required when the requested accommodation would undermine the fundamental function of the position. "The First Amendment . . . gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710, 105 S.Ct. 2914, 2918 (1985) (citations omitted). There is no less restrictive alternative than discipline for Judge Neely that would serve the compelling state interest in judicial integrity.

[¶38] Judge Neely's refusal to perform marriage ceremonies for same-sex couples, in spite of the law recognizing their right to be married, implicates the compelling state interest in maintaining the integrity, independence, and impartiality of the judiciary. Imposing discipline on her for such conduct is not underinclusive or overbroad. We will address the scope of the discipline necessary and permissible under the narrowly-tailored standard below. *See infra* ¶¶ 72-75.

## II. Does the Wyoming Constitution permit this Court to discipline Judge Neely for announcing that her religious beliefs prevent her from officiating same-sex marriages?

[¶39]  The Wyoming Constitution can offer "broader protection than the United States Constitution." *Andrews v. State*, 2002 WY 28, ¶ 31, 40 P.3d 708, 715 (Wyo. 2002); *see also O'Boyle v. State*, 2005 WY 83, ¶ 23, 117 P.3d 401, 408 (Wyo. 2005).  "Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned." *Bear Cloud v. State*, 2014 WY 113, ¶ 14, 334 P.3d 132, 137 (Wyo. 2014) (quoting *Saldana v. State*, 846 P.2d 604, 622 (Wyo. 1983) (Golden, J., concurring)).

[¶40]  Judge Neely offers an articulable, reasonable, and reasoned argument for considering whether Wyoming Constitution, article 1, section 18 and article 21, section 25 provide greater protection than does the United States Constitution.[9]  They provide:

> The free exercise and enjoyment of religious profession and worship without discrimination or preference shall be forever guaranteed in this state, and no person shall be rendered incompetent to hold any office of trust or profit, or to serve as a witness or juror, because of his opinion on any matter of religious belief whatever; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state.

Wyo. Const. art. 1, § 18.  Judge Neely points out that this provision is significantly broader than the similar provision in the United States Constitution—"but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."  U.S. Const. art. VI.

> Perfect toleration of religious sentiment shall be secured, and no inhabitant of this state shall ever be molested in person or property on account of his or her mode of religious worship.

Wyo. Const. art. 21, § 25.  In contrast, the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . . "  U.S. Const. amend. I.

---

[9] Her reference to Wyoming Constitution, Article 1, section 20 (free speech rights) contains no argument for why the Wyoming Constitution might provide greater free speech rights than does the First Amendment of the United States Constitution, and we will therefore not address that provision of the Wyoming Constitution separately.

15

[¶41] In construing the Wyoming Constitution, we follow the same rules as those we apply to statutory interpretation. Our "fundamental purpose is to ascertain the intent of the framers." *Cathcart v. Meyer*, 2004 WY 49, ¶ 39, 88 P.3d 1050, 1065 (Wyo. 2004) (citations omitted). Judge Neely argues that these provisions in Wyoming's Constitution are broader than the First Amendment of the United States Constitution, and broader than those of other states. She further directs us to the debates during the constitutional convention, which indicate article 1, section 18 was adopted in conjunction with the defeat of a proposed amendment, "aimed at the state's Mormon population, that would have prohibited anyone who entered into or believed in polygamy from voting, holding public office, or serving as a juror." Robert B. Keiter & Tim Newcomb, *The Wyoming State Constitution*, at 69 (2011).[10] Courts of other states with similar constitutional language have held that their state constitutions provided stronger protection than the federal constitution. *See First Covenant Church of Seattle v. City of Seattle*, 840 P.2d 174, 224 (Wash. 1992); *State v. Hersberger*, 462 N.W.2d 393, 397 (Minn. 1990).

[¶42] The language of Wyoming Constitution article 1, section 18 and article 21, section 25 may offer broader protections than does the United States Constitution, but we do not find that the protections they may offer are applicable to Judge Neely's circumstances here. That is because neither her opinion on matters of her religious belief, nor her religious sentiment, are the focus of the state action.

[¶43] Referring to the debates of the constitutional convention, Judge Neely asserts that this Court should conclude that, "just as a Mormon judge who believes in polygamy cannot be excluded from judicial office because of her beliefs about marriage, neither may Judge Neely or others be expelled as municipal judges because of their sincere beliefs about that issue." This argument ignores the important distinction between the freedom to believe and the freedom to act. "While the freedom to believe is absolute, the freedom to act cannot be. 'Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection.'" *Trujillo v. State*, 2 P.3d 567, 576-77 (Wyo. 2000) (quoting *Cantwell*,

---

[10] We have noted before that:

> The debates of the convention are not a very reliable source of information upon the subject of the construction of any particular word or provision of the constitution. As we understand the current of authority, and the tendency of the courts, they may for some purpose, but in a limited degree, be consulted in determining the interpretation to be given some doubtful phrase or provision; but, as a rule, they are deemed an unsafe guide.

*Powers v. State*, 2014 WY 15, ¶ 39, 318 P.3d 300, 314 (Wyo. 2014), *reh'g denied* (Feb. 12, 2014) (quoting *Rasmussen v. Baker*, 7 Wyo. 117, 138, 50 P. 819, 824 (Wyo. 1897)).

16

310 U.S. at 304, 60 S.Ct. at 903). In *Trujillo*, we rejected the appellant's challenge to state drug laws on both United States and Wyoming constitutional grounds, and we held the notion that compliance with the law could be "contingent upon the law's coincidence with his religious beliefs," thus making him "a law unto himself," would contradict "both constitutional tradition and common sense." *Trujillo*, 2 P.3d at 575 n.4, 577 (quoting *Smith,* 494 U.S. at 885, 110 S.Ct. at 1603). The Wyoming Constitution does not give Judge Neely the prerogative to perform her judicial functions contingent upon the law's coincidence with her religious beliefs.

[¶44] Just like the county clerk in *Miller v. Davis*, 123 F.Supp.3d 924, 944 (E.D. Ky. 2015), *appeal dismissed, cause remanded by Miller v. Davis*, Nos. 15-5880, 15-5978, 2016 WL 3755870 (6th Cir. July 13, 2016) (finding county clerk must issue marriage licenses to same-sex couples), Judge Neely remains "free to practice her [religious] beliefs," and she is "free to believe that marriage is a union between one man and one woman, as many Americans do. However, her religious convictions cannot excuse her from performing the duties that she took an oath to perform . . . ." *Id*. "The State is not asking her to condone same-sex unions on moral or religious grounds, nor is it restricting her from engaging in a variety of religious activities." *Id*. Judge Neely is not being "molested . . . on account of [her] mode of religious worship." Wyo. Const. art. 21, § 25.

[¶45] The Alabama Supreme Court rejected a similar argument by Chief Justice Roy Moore, when he was removed from his position as a consequence of his refusal to comply with a federal court order enjoining him to remove a monument to the Ten Commandments that he had placed in the rotunda of the Alabama Judicial Building. *Moore v. Judicial Inquiry Comm'n of State of Alabama*, 891 So.2d 848, 851 (Ala. 2004). Justice Moore argued that he was being removed from office because of a "religious test," in violation of the Alabama Constitution[11] and the free exercise clause of the United States Constitution. The court cited with approval two federal courts which

> concluded that this case is not about a public official's right to acknowledge God, as Chief Justice Moore contends. Rather, this case is about a public official who took an oath to uphold the Constitution of the United States and then refused to obey a valid order of a United States District Court holding that the placement of the monument in the Judicial Building violated the Establishment Clause of the First Amendment to the United States Constitution.

*Id.* at 859.

---

[11] Alabama Constitution section 3 provides that "no religious test shall be required as a qualification to any office or public trust under this state." *Moore*, 891 So.2d at 858 (citation omitted).

[¶46] It is likely correct, as Judge Neely contends, that "a Mormon judge who believes in polygamy cannot be excluded from judicial office because of her beliefs about marriage," but if a judge broke the law against polygamy by maintaining multiple marriages, she would be removed as a judge because she broke the law, not because of her beliefs. *See, e.g., In re Steed*, 131 P.3d 231, 232 (Utah 2006) (The court removed the judge because his multiple marriages were contrary to law, holding "it is of little or no consequence that the judge may believe a criminal statute is constitutionally defective.") Similarly, Judge Neely has done more than express her opinion on a matter of religious belief. She has taken the position that, although she has sworn to "support, obey and defend" the constitutions of the United States and Wyoming, when it comes to same-sex marriages, she will decline to do so. Judge Neely is not being disciplined "because of [her] opinion on any matter of religious belief," she is being disciplined because of her conduct. Thus, Wyoming Constitution article 1, section 18 and article 21, section 25 are not violated by such discipline.

[¶47] Our conclusion is further reinforced by an examination of the entire Wyoming Constitution, for "[e]very statement in the constitution must be interpreted in light of the entire document, with all portions thereof read in *pari materia*." *Cathcart*, 2004 WY 49, ¶ 40, 88 P.3d at 1065-66. In addition to protecting religious freedom, our constitution recognizes the importance of equal rights for all.

[¶48] "In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are created equal." Wyo. Const. art. 1, § 2. "No person shall be deprived of life, liberty or property without due process of law." Wyo. Const. art. 1, § 6.

> Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever other than individual incompetency, or unworthiness duly ascertained by a court of competent jurisdiction.

Wyo. Const. art. 1, section 3. The Wyoming Constitution also contains its own variation of the federal establishment clause. *See* Wyo. Const. art. 1, § 19 (Appropriations for sectarian or religious societies or institutions prohibited); Wyo. Const. art. 7, § 12 (Sectarianism prohibited). "Considering the state constitution's particular call for equal protection, the call to recognize basic rights, and notion that these particular protections are merely illustrative, the Wyoming Constitution is construed to protect people against legal discrimination more robustly than does the federal constitution." *Johnson v. State Hearing Examiner's Office*, 838 P.2d 158, 165 (Wyo. 1992). Judge Neely would have us find, not only that the religious liberty provisions of the Wyoming Constitution provide greater protections than the United States Constitution provides, but also that they trump

18

all other provisions of the Wyoming Constitution. That is contrary to the rules of constitutional interpretation.

[¶49] Applying our rule that, in interpreting the constitution, "no part will be inoperative or superfluous," *Geringer v. Bebout*, 10 P.3d 514, 520 (Wyo. 2000), we could not read the provisions recognizing religious liberty to render those provisions recognizing equal rights and due process to be inoperative or superfluous. Judge Neely contends that the religious freedom provisions of the Wyoming Constitution entitle her to act in accordance with her religious beliefs, so long as they do not "foster[] licentiousness or jeopardize[] public safety." Such a rule would permit her, and any other judge, to apply the law in accordance with their individual views on what "divine law" required, to the exclusion of any other right under the Wyoming Constitution. That is an untenable position.

> Can a man excuse his practices . . . because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.

*Reynolds v. United States*, 98 U.S. 145, 166-67, 25 L.Ed. 244 (1878).

[¶50] Further, the broad reading of the Wyoming constitutional provisions recognizing freedom of religion that Judge Neely urges upon us would also require us to find that those provisions of the state constitution trump the federal due process and equal protection rights that the United States Supreme Court relied upon in *Obergefell*, 135 S.Ct. at 2602-03. If we held that freedom of religious opinion meant no state official in Wyoming had to marry a same-sex couple if it offended his or her religious belief, the right of same-sex couples to marry under the United States Constitution would be obviated. "The State of Wyoming is an inseparable part of the federal union, and the constitution of the United States is the supreme law of the land." Wyo. Const. art. 1, § 37.

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U. S. Const. art. VI.

19

[¶51] The United States Supreme Court explained this when Arkansas state officials sought to avoid school desegregation, arguing in part that they were not bound by the Court's holding in *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

> Article VI of the Constitution makes the Constitution the 'supreme Law of the Land.' In 1803, Chief Justice Marshall, speaking for a unanimous Court, referring to the Constitution as 'the fundamental and paramount law of the nation,' declared in the notable case of *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 [(1803)], that 'It is emphatically the province and duty of the judicial department to say what the law is.' This decision declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system. It follows that the interpretation of the Fourteenth Amendment enunciated by this Court in the *Brown* case is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, ¶3 'to support this Constitution.' Chief Justice Taney, speaking for a unanimous Court in 1859, said that this requirement reflected the framers' 'anxiety to preserve it [the Constitution] in full force, in all its powers, and to guard against resistance to or evasion of its authority, on the part of a State. ***' [Citation omitted.]

*Cooper v. Aaron*, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409-10, 3 L.Ed.2d 5 (1958); *see also Williams v. Eaton*, 443 F.2d 422, 429 (10th Cir. 1971) ("[I]f plaintiffs establish a violation of Federal constitutional rights and entitlement to relief under the Federal civil rights acts, the Wyoming Constitution may not immunize the defendants and override the Federal constitutional principles . . . .").

[¶52] Just last year, Alabama Chief Justice Roy Moore was suspended from office because of his instruction to Alabama probate judges to disregard the opinion of the United States Supreme Court. He said that "the *Obergefell* opinion, being manifestly absurd and unjust and contrary to reason and divine law, is not entitled to precedential value." *In the Matter of: Roy S. Moore, Chief Justice, Supreme Court of Alabama*, Alabama Court of the Judiciary Case No. 46, *Final Judgment*, at 15 (September 30,

2016).  As the Court of the Judiciary held, an individual judge's interpretation of divine law must give way to the "supreme law of the land."  *Id.* at 34.[12]

[¶53]  The religious freedom provisions of the Wyoming Constitution do not prohibit the state from proceeding with disciplinary action against Judge Neely for her stated refusal to conduct same-sex marriages.

### III.  Are the provisions of the Wyoming Code of Judicial Conduct alleged to have been violated by Judge Neely void for vagueness?

[¶54]  Judge Neely argues that the provisions of the Wyoming Code of Judicial Conduct that she is charged with violating are void for vagueness, citing U.S. Const. amends. I and XIV; Wyo. Const. art. 1, §§ 6, 7, 20.  "The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement."  *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051, 111 S.Ct. 2720, 2732, 115 L.Ed.2d 888 (1991).  A "provision is not unconstitutionally vague if its wording can reasonably be said to provide sufficient notice to a person of ordinary intelligence that his conduct was [contrary to the rules]."  *Guilford v. State*, 2015 WY 147, ¶ 15, 362 P.3d 1015, 1018 (Wyo. 2015).  Judge Neely again mischaracterizes the conduct for which she is being disciplined as "honestly conveying her religious beliefs," and she argues that "the Commission could use Rule 1.2's vague language to punish a judge who expresses her moral belief that human life begins at conception . . . ."  However, as discussed above, Judge Neely is not being disciplined for her expression of her religious beliefs, but for her conduct in refusing to impartially perform her judicial functions.

---

[12] The law recognizes no hierarchy of sincerely held religious beliefs. "'[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'"  *Church of the Lukumi Babalu*, 508 U.S. at 531, 113 S.Ct. at 2225 (quoting *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981)).  Yet if Judge Neely had taken the position that her religion prevented her from conducting interracial marriages, a right which our society now generally accepts, there would be little controversy regarding her discipline.  While we respect the religious views of those who deem same-sex marriage to be wrong, we cannot give those views greater weight in our constitutional analysis simply because they are more widely held.

> The idea of the Constitution "was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts."  *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).  This is why "fundamental rights may not be submitted to a vote; they depend on the outcome of no elections."  *Ibid.*  It is of no moment whether advocates of same-sex marriage now enjoy or lack momentum in the democratic process.

*Obergefell*, 135 S. Ct. at 2605-06.

[¶55] Further, Judge Neely ignores the law which recognizes that the standard for vagueness is relaxed when applied to codes of professional conduct.

> Given the traditions of the legal profession and an attorney's specialized professional training, there is unquestionably some room for enforcement of standards that might be impermissibly vague in other contexts; an attorney in many instances may properly be punished for "conduct which all responsible attorneys would recognize as improper for a member of the profession."

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 666, 105 S.Ct. 2265, 2289, 85 L.Ed.2d 652 (1985) (Brennan, J., concurring in part and dissenting in part) (citation omitted). The same rationale has been applied to judicial codes of conduct. *See, e.g., Matter of Halverson*, 169 P.3d 1161, 1176 (Nev. 2007) ("[W]hen evaluating a statute that applies only to judges, the issue is whether an ordinary judge could understand and comply with it."). And in fact, courts have consistently rejected vagueness challenges in judicial discipline matters. *Matter of Halverson*, 169 P.3d at 1176; *Judicial Conduct Comm'n v. McGuire (In re McGuire)*, 685 N.W.2d 748, 761 (N.D. 2004); *In re Barr*, 13 S.W.3d 525, 565 (Tex. Rev. Trib. 1998); *In re Complaint Against Harper*, 673 N.E.2d 1253, 1263, (Ohio 1996); *In re Disciplinary Proceeding Against Ritchie*, 870 P.2d 967, 972 (Wash. 1994); *Matter of Young*, 522 N.E.2d 386, 387-88 (Ind. 1988); *Matter of Seraphim*, 294 N.W.2d 485, 493, (Wis. 1980).

[¶56] Although Judge Neely is not an attorney, she has been a municipal court judge since 1994, and she served on the Select Committee to review the Wyoming Code of Judicial Conduct in 2008. That committee met many times, and as a consequence, Judge Neely was familiar with the Wyoming Code of Judicial Conduct. Judge Neely's own conduct tells us that she understood her refusal to perform same-sex marriages could be a code violation. She met with Judge Haws to express her concern to him, and then she wrote to the Judicial Ethics Advisory Committee to ask if she could recuse herself from officiating same-sex weddings "without fear of civil rights repercussions." We do not mean to suggest that Judge Neely should be faulted for asking the questions (although we note, as did the Judicial Ethics Advisory Committee, that her request for guidance from them came after she had already engaged in the conduct at issue here, and appeared to be more of a request for their approval than a request for guidance); we simply observe that this conduct indicates she suspected her position would put her in conflict with the Wyoming Code of Judicial Conduct. We find that an ordinary judge would also understand that refusal to conduct some marriages on the basis of the sexual orientation of the couple did not comply with the Code of Judicial Conduct and thus, it is not unconstitutionally vague.

## IV. Did Judge Neely violate the Wyoming Code of Judicial Conduct?

[¶57] Because the Wyoming Supreme Court makes the initial determination whether to impose discipline on a judicial officer, we do not "review" a recommendation of the Commission on Judicial Conduct and Ethics in the same way that we review decisions of the district courts. Wyo. Const. art. 5, § 6(f). Our approach here is analogous to our approach in attorney discipline cases. While the Court "gives due consideration to the findings and recommendations of the Board, [] 'the ultimate judgment in these cases is vested in this Court.'" *Bd. of Prof'l Responsibility v. Custis*, 2015 WY 59, ¶¶ 19-21, 348 P.3d 823, 829 (Wyo. 2015) (citations omitted). Although the Commission urges us to give its findings a "significant degree of deference," we decline to do so, particularly in this case which was decided on cross-motions for summary judgment, which we review de novo. *Snell v. Snell*, 2016 WY 49, ¶ 18, 374 P.3d 1236, 1240 (Wyo. 2016) (On review of summary judgment, "[w]e examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record." (citation omitted)). We therefore engage in a de novo review of the record to decide whether there is clear and convincing evidence that Judge Neely violated the Wyoming Code of Judicial Conduct. Rules Governing the Commission on Judicial Conduct and Ethics, Rule 16(b). "Clear and convincing evidence" is defined as "that kind of proof which must persuade . . . that the truth of a contention is highly probable." Rules Governing the Commission on Judicial Conduct and Ethics, Rule 2(b). We review questions of law de novo, without giving any deference to the lower tribunal's determinations. *Pope v. Rosenberg*, 2015 WY 142, ¶ 15, 361 P.3d 824, 829 (Wyo. 2015).

[¶58] The primary objective of judicial discipline is to hold judges to a high ethical standard that fosters public confidence in the integrity and impartiality of the judiciary. Garwin, *supra*, at 3; *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000). "Unlike the other branches of government, the authority of the judiciary turns almost exclusively on its credibility and the respect warranted by its rulings . . . ." *Carey v. Wolnitzek*, 614 F.3d 189, 194 (6th Cir. 2010). The *Preamble* to the Wyoming Code of Judicial Conduct describes the critical importance of such a high standard for the judiciary:

> An independent, fair and impartial judiciary is indispensable to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society. Thus, the judiciary plays a central role in preserving the principles of justice and the rule of law. Inherent in all the Rules contained in this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system.

23

## A. Rule 1.1.

[¶59] **Rule 1.1. Compliance with the Law.**

> A judge shall comply with the law, including the Code of Judicial Conduct.

The Commission found that Judge Neely's unwillingness to perform same-sex marriages is a violation of Rule 1.1. The vast majority of Rule 1.1 violations are found when a judge violates a criminal law in his or her personal conduct. *See, e.g., In re Coffey's Case*, 949 A.2d 102, 120 (N.H. 2008) (judge violated code when she transferred assets in violation of Fraudulent Transfer Act); *Disciplinary Counsel v. Ault*, 852 N.E.2d 727, 728, 730 (Ohio 2006) (municipal court judge, convicted of attempting to obtain dangerous drugs by deception, violated code). As leading commentators have explained: "Whereas Rule 1.1 addresses the judge's duty to comply with the law in his or her daily life, this Rule [Rule 2.2] directs the judge to follow the rule of law when deciding cases." Garwin, *supra*, at 93. Here, there is no suggestion that Judge Neely has failed to comply with the law in her daily life.

[¶60] The Commission directs us to a handful of cases in which judges were found to have violated Rule 1.1 as a result of their failure to properly apply the law in executing their judicial functions. However, in all those cases, the judges had violated clear procedural rules of law. *See In re Bennington*, 24 N.E.3d 958, 961 (Ind. 2015) (The judge did not comply with Indiana law when she did not "(a) sentence [defendant] to a set time in jail for contempt, (b) indicate when he would be released, (c) reduce her order to writing as Indiana Code section 34-47-2-4 requires, (d) appoint him an attorney before jailing him for contempt, nor (e) inform him of his right to appeal his contempt sentence."); *In re Harkin*, 958 N.E.2d 788, 791 (Ind. 2011) (The judge violated Rule 1.1 when he failed to comply with Indiana law by "referring traffic infraction litigants to the Traffic School and then dismissing their cases upon their completion of the program without any dismissal request from the prosecutor . . . ."); *In re Young*, 943 N.E.2d 1276, 1280 (Ind. 2011) (judge's imposition of penalties for traffic infractions in excess of amount authorized by law violated Rule 1.1). The Commission also cites a Texas case in which a judge was disciplined for his failure to comply with the law, for his use of writs of attachment to secure the accused's appearance at a peace bond hearing, his use of mediation in the peace bond context, and his issuance of arrest warrants without a complete written complaint, all in violation of Texas law. *In re Jones*, 55 S.W.3d 243, 248 (Tex. Spec. Ct. Rev. 2000). The Minnesota Supreme Court found violations of Rule 1.1 as a result of failure to comply with the law in the judge's judicial role in *In re Perez*, 843 N.W.2d 562, 564 (Minn. 2014) (The judge "failed to release opinions in compliance with Minn.Stat. § 271.20, falsely certified that he was in compliance with Minn.Stat. § 271.20, and made false statements in his orders regarding the date cases were submitted for decision, in violation of Minn.Stat. § 271.20 . . . .").

24

[¶61]  Even if we were to adopt this minority application of Rule 1.1, Judge Neely has not violated a clear procedural rule governing the performance of her legal duties.  As a municipal court judge, she had no authority to perform marriages.  As a part-time circuit court magistrate, she had the power to perform marriage ceremonies, but she was not required to do so.  She has not violated the law in her daily life, and she has not violated a procedural rule of law, as occurred in the cases cited by the Commission, *see supra* ¶ 60.  Our conclusion that the requirement to comply with the law at Rule1.1 addresses a much more specific violation than is present here is bolstered by the existence of other rules applicable to a judge's application of the law.  Rules 1.2, 2.2, and 2.3 address the necessity of a judge's impartiality and absence of bias in the performance of her duties.  Those rules are better fitted to the type of judicial misconduct at issue here.  There is no need to stretch the requirement to comply with the law to this situation, where performance of marriages is a discretionary duty.  We recognize that the language of Rule 1.1 includes compliance with the Code of Judicial Conduct.  So to the extent that Judge Neely has violated other rules of the code, she has violated Rule 1.1.  However, we find that, standing alone, her conduct does not violate Rule 1.1.

**B.   Rule 1.2.**

[¶62]          **Rule 1.2.  Promoting Confidence in the Judiciary.**

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

The parties dispute the proper application of the "objective standard" that should be applied to the "appearance of impropriety" determination.  Judge Neely advocates the use of the standard applied by the Mississippi Supreme Court: "The test for impropriety is whether a judge's impartiality might be questioned by a reasonable person knowing all the circumstances." *Mississippi Comm'n on Judicial Performance v. Boland*, 975 So.2d 882, 895 (Miss. 2008).  The Commission contends that this standard is unduly restrictive and argues that we should apply the standard used by Alaska, which sets forth the "objectively reasonable person test" to determine whether the judge failed "to use reasonable care to prevent objectively reasonable persons from believing an impropriety was afoot." *In re Johnstone*, 2 P.3d at 1235.  We do not find this debate to be particularly fruitful.  We apply the standard contained in the Wyoming Code of Judicial Conduct comments to this rule:

> Actual improprieties include violations of law, court rules or provisions of this Code.  The test for appearance of impropriety is whether the conduct would create in

25

reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge.

Wyoming Code of Judicial Conduct, Rule 1.2, Comment 5. It goes without saying that the "reasonable minds" would be fully informed of the relevant facts and circumstances, and we do not find conflict between the standards proposed by the parties.[13]

[¶63] The Commission found that Judge Neely's announcement that she would not perform same-sex marriages violated Rule 1.2 by giving "the impression to the public that judges, sworn to uphold the law, may refuse to follow the law of the land." Judge Neely contends that "no reasonable person knowing the following facts would conclude that Judge Neely's religious beliefs about marriage render her incapable of fairly adjudicating legal matters for LGBT citizens." However, the facts she goes on to cite are unpersuasive. First, she emphasizes that solemnizing marriages is a discretionary function, but we reject that argument because the requirement of impartiality cannot be limited to only certain types of judicial functions. In essence, this is an argument that bias or prejudice is acceptable if the judicial function is discretionary. Our society requires a fair and impartial judiciary no matter how the judicial function is classified. The Code of Judicial Conduct recognizes this when it says "The Rules in this Code have been formulated to address the ethical obligations of any person who serves a judicial function, and are premised upon the supposition that a uniform system of ethical principles should apply to all those authorized to perform judicial functions." Wyoming Code of Judicial Conduct, *Application*, Comment 1.

[¶64] The Washington Commission on Judicial Conduct reached the same conclusion in its Stipulation, Agreement and Order of Admonishment with a judge who told his colleagues he was "uncomfortable" performing same-sex marriages and asked them to officiate in his stead. *In re Matter of: The Honorable Gary Tabor, Thurston County*

---

13 It is, of course, possible to interpret the phrase "appearance of impropriety" much more broadly and to suggest that it embraces a situation *where the facts are only partially known,* and where this partial version of the facts might rouse legitimate suspicion. Suppose, for example, that it was known only that Judge Haynsworth had *some* stock in the litigant, without it being known how miniscule his interest was? *But this interpretation would cut so broadly as to prevent a judge named Jones from presiding at the trial of a defendant named Jones, even though they were totally unrelated, since it would be possible from simply reading the docket entries to conclude that they were related to one another.* It will not do.

*Matter of Larsen*, 616 A.2d 529, 583 (1992) (quoting Rehnquist, *Sense and Nonsense About Judicial Ethics*, 28 The Record 694, 701 (1973)) (emphasis in original).

*Superior Court Judge*, WA Jud. Disp. Op. 7251-F-158, 2013 WL 5853965, at *1 (Wash. Com. Jud. Cond. 2013). In response to press inquiries, Judge Tabor explained that his decision was based on his religious views, and he expressed his belief that "since judges are not required, but are only permitted, to perform marriages," he was within his rights to decline to perform same-sex marriages. The Commission on Judicial Conduct disposed of that argument:

> Respondent is not required as a judicial officer to solemnize marriages. Having chosen to make himself available to solemnize some weddings, however, he is bound by the Code of Judicial Conduct to do so in a way that does not discriminate or appear to discriminate against a statutorily-protected class of people.

*Id.* at *2.

[¶65] Judge Neely then contends that solemnizing marriages is unlike other magisterial functions because it "involves personally participating in, celebrating, and expressing support for a marital union . . . ." However, Wyoming law does not require the person performing the ceremony to condone the union. Marriage is "a civil contract . . . ." Wyo. Stat. Ann. § 20-1-101.

> In the solemnization of marriage no particular form is required, except that the parties shall solemnly declare in the presence of the person performing the ceremony and at least two (2) attending witnesses that they take each other as husband and wife.

Wyo. Stat. Ann. § 20-1-106(b) (LexisNexis 2015).

[¶66] Judge Neely states that she would perform other magisterial functions for gays and lesbians, she would help them find someone else who would perform marriages, she does not question the legality of same-sex marriage in Wyoming and would recognize the validity of such marriages, and that homosexuals in Pinedale do not question her impartiality as a judge. We accept all of these allegations as true. However, they are insufficient to overcome the fact that she has unequivocally stated her refusal to perform marriages for same-sex couples, which creates the perception in reasonable minds that she lacks independence and impartiality.[14] We conclude that Judge Neely has violated Rule 1.2.

---

[14] "Impartiality" includes the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties . . . ." "Impropriety" includes conduct "that undermines a judge's independence, integrity, or impartiality." Wyoming Code of Judicial Conduct, *Terminology*.

## C.   Rule 2.2.

[¶67]        **Rule 2.2.  Impartiality and Fairness.**

> A judge shall uphold and apply the law, and shall perform
> all duties of judicial office fairly and impartially.

Judge Neely's primary function as a circuit court magistrate was to perform marriages. She has taken the position that she is willing to do that for one class of people (opposite-sex couples), but not for another (same-sex couples), in spite of the fact that the law provides both classes are entitled to be married.  That is not fair and impartial performance by any measure.  Comment 2 to Rule 2.2 is exactly on point:

> Although each judge comes to the bench with a unique
> background and personal philosophy, a judge must interpret
> and apply the law without regard to whether the judge
> approves or disapproves of the law in question.

Wyoming Code of Judicial Conduct, Rule 2.2, Comment 2.  The Court respects Judge Neely's religious beliefs, but when she allows them to interfere with her fair and impartial application of the law, she violates Rule 2.2 and undermines the public confidence in the integrity of the judiciary.

## D.   Rule 2.3.

[¶68]        **Rule 2.3.  Bias, Prejudice, and Harassment.**

> (A)  A judge shall perform the duties of judicial office,
> including administrative duties, without bias or prejudice.
> (B)  A judge shall not, in the performance of judicial
> duties, by words or conduct manifest bias or prejudice, or
> engage in harassment, including but not limited to bias,
> prejudice, or harassment based upon race, sex, gender,
> religion, national origin, ethnicity, disability, age, sexual
> orientation, marital status, socioeconomic status, or political
> affiliation, and shall not permit court staff, court officials, or
> others subject to the judge's direction and control to do so.

The Commission found that Judge Neely's "expression of her inability to perform same sex marriages, manifested a bias with respect to sexual orientation."

[¶69] Judge Neely argues that her comments to the reporter did not manifest "bias or prejudice"[15] based upon "sexual orientation," but merely expressed her sincerely held religious belief. But Judge Neely did more than express her religious belief. She expressed her position that, in her performance of her judicial function, the law would have to yield to her religious beliefs. ("When law and religion conflict, choices have to be made.") The dissent suggests that Judge Neely should not be disciplined because no same-sex couple has asked her to officiate at a wedding and been turned away. But that is not likely to happen, given her clear and public statement refusing to perform same-sex marriages. She would therefore perform her judicial functions as a circuit court magistrate for one class of people, but not another.

[¶70] Comment 2 to Rule 2.3 states in part: "A judge must avoid conduct that may reasonably be perceived as prejudiced or biased." Judge Neely's refusal to perform same sex marriages exhibits bias and prejudice toward homosexuals. *See Supreme Court of Ohio, Board of Professional Conduct*, Opinion 2015-1, *Judicial Performance of Civil Marriages of Same-Sex Couples*, at 4-5 (August 7, 2015) ("A judge who is willing to perform marriages of only opposite-sex couples because of his or her personal, moral, or religious beliefs, may be viewed as possessing a bias or prejudice against a specific class or group of people based on sexual orientation.") Judge Neely asserts in her affidavit that she has no bias or prejudice against homosexuals. We examine the record in a light most favorable to Judge Neely and accept that averment, but our inquiry is whether her conduct may reasonably be perceived as prejudiced or biased. *See Caperton*, 556 U.S. at 881, 129 S.Ct. at 2262 ("The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral . . . ."); *In Matter of: The Honorable Gary Tabor*, 2013 WL 5853965, at *3 ("[A] judge must not only be impartial, but must also be perceived as impartial . . . ."). Judge Neely's refusal to conduct marriages on the basis of the couple's sexual orientation can reasonably be perceived to be biased. We therefore conclude that Judge Neely violated Rule 2.3.

[¶71] Our conclusion that Judge Neely's expressed refusal to conduct same-sex marriages violates the Code of Judicial Conduct is in line with every other tribunal that has considered the question. The judges in *In re Matter of: The Honorable Gary Tabor* and *In re Roy S. Moore*, were disciplined for their conduct. Five state advisory commissions offered opinions, consistently stating that a judge may not perform judicial functions for some parties while declining to perform them for same-sex couples without violating the Code of Judicial Conduct: *Supreme Court of Ohio, Board of Professional Conduct*, Opinion 2015-1, *Judicial Performance of Civil Marriages of Same-Sex Couples* (August 7, 2015) (a judge may not decline to perform same-sex marriages, and may not

---

[15] "Bias" is "[a] mental inclination or tendency; prejudice; predilection." Black's Law Dictionary 192 (10th ed. 2014). "Prejudice" is "[a] preconceived judgment or opinion formed with little or no factual basis; a strong and unreasonable dislike or distrust." Black's Law Dictionary 1370 (10th ed. 2014).

29

decline to perform all marriages in order to avoid marrying same-sex couples); *Supreme Court of Wisconsin, Judicial Conduct Advisory Committee*, Opinion No. 15-1 (August 18, 2015) (judge may not decline to perform only same-sex marriages, but may decline performing all marriages); *Arizona Supreme Court, Judicial Ethics Advisory Committee*, Revised Advisory Opinion 15-01, *Judicial Obligation to Perform Same-Sex Marriages* (March 9, 2015) (judge may not distinguish between same-sex and opposite-sex couples); *Nebraska Judicial Ethics Committee Opinion*, Opinion 15-1 (June 29, 2015) (a judge who is willing to perform traditional marriage manifests bias or prejudice by refusing to perform same-sex marriage); *Judicial Conduct Board of Pennsylvania Newsletter*, *Impartiality in Solemnizing Marriages*, by Elizabeth A. Flaherty, Deputy Counsel, Judicial Conduct Board (No. 3 Summer 2014) (judge who decides not to perform wedding ceremonies for same-sex couples must opt out of officiating at *all* wedding ceremonies). Only in *Mississippi Comm'n on Judicial Performance v. Wilkerson*, 876 So.2d 1006, 1016 (Miss. 2004), did the tribunal find that a judge's comments disparaging gays and lesbians did not violate the Code of Judicial Conduct. But there, only the judge's speech as a private citizen was at issue; not his conduct as a judge, and there was no issue of performing marriages. *See Boland*, 975 So.2d at 892 (distinguishing *Wilkerson* on basis that judge in *Boland* made remarks while acting in her judicial capacity).

## *SANCTIONS*

[¶72]  We turn to the determination of the appropriate sanctions to be imposed as a result of Judge Neely's violations of Rules 1.2, 2.2, and 2.3 of the Wyoming Code of Judicial Conduct.  The purpose of judicial discipline is primarily to protect the public, but of necessity it has punitive effects.

> The punitive aspect of judicial discipline serves multiple purposes: it discourages further misconduct on the part of the disciplined judge and the judiciary as a whole; it reinforces the general perception that judicial ethics are important; and it promotes public confidence by demonstrating that the judicial system takes misconduct seriously. Punishment thus subserves the various goals of judicial discipline, but is a means, not an end.

*In re Johnstone*, 2 P.3d at 1234; *see also In re Judicial Campaign Complaint Against O'Toole*, 24 N.E.3d 1114, 1129 (Ohio 2014) (listing purposes of judicial discipline).

[¶73] The Commission has recommended that Judge Neely be removed from her positions as a part-time circuit court magistrate and as a municipal court judge; however, we may modify or reject that recommendation.  Wyo. Const. art 5, § 6(f)(iv); Rules Governing the Commission on Judicial Conduct and Ethics, Rule 19(a).  We approach our sanctions analysis mindful of our standard under strict scrutiny, which requires us to

narrowly tailor the restrictions on Judge Neely's speech and religious expression. We endeavor to craft a sanction that does not "unnecessarily circumscrib[e] protected expression." *White*, 536 U.S. at 775, 122 S. Ct. at 2535 (Scalia, J., with three justice concurring and one concurring in the result) (quoting *Brown v. Hartlage*, 456 U.S. 45, 54, 102 S.Ct. 1523, 1529, 71 L.Ed.2d 732 (1982). We are also guided by the relevant factors for determining the appropriate sanctions set forth in Rule 8(d)(2) of the Rules Governing the Commission on Judicial Conduct and Ethics:

> (A)     *the nature, extent, and frequency of the misconduct*

Judge Neely's refusal to conduct same-sex marriages, and her indication that her religious beliefs would override the rule of law undermines public confidence in the integrity and impartiality of the judiciary. But her misconduct was an isolated response to a quickly-changing legal landscape, one in which many judges have experienced similar turmoil. *See supra* ¶ 71.

> (B)     *the judge's experience and length of service on the bench*

Judge Neely has had a long career as a municipal court judge and as a part-time circuit court magistrate; a career for which she is widely respected.

> (C)     *whether the conduct occurred in the judge's official capacity or private life*

As discussed above, the misconduct occurred in Judge Neely's official capacity. She did not merely express her opinion about same-sex marriage, she expressed how that opinion would impact her performance of her judicial functions.

> (D)     *the nature and extent to which the acts of misconduct injured other persons or respect for the judiciary*

There is no evidence that any person has been injured. And while there is no evidence of injury to respect for the judiciary, under the objective standard that we apply, we have concluded that her conduct does undermine the public's respect for the judiciary.

> (E)     *whether and to what extent the judge exploited his or her position for improper purposes*

Judge Neely has not exploited her position for improper purposes.

> (F)     *whether the judge has recognized and acknowledged the wrongful nature of the conduct and manifested an effort to change or reform the conduct*

Judge Neely has not recognized or acknowledged the wrongful nature of her conduct, nor has she indicated that she would consider performing same-sex marriages.

> (G)     *whether there has been prior disciplinary action concerning the judge, and if so, its remoteness and relevance to the present proceeding*

There have been no prior disciplinary actions concerning Judge Neely.

*(H)     whether the judge complied with prior discipline or requested and complied with a formal ethics advisory opinion*

Judge Neely requested a formal ethics advisory opinion, but only after she had engaged in the objectionable conduct.

*(I)     whether the judge cooperated fully and honestly with the Commission in the proceeding*

Judge Neely cooperated fully and honestly with the Commission in the proceeding.

[¶74]  Weighing these factors, we find that Judge Neely's misconduct warrants a public censure.  We further find that Judge Neely must perform her judicial functions, including performing marriages, with impartiality.   She must either commit to performing marriages regardless of the couple's sexual orientation, or cease performing all marriage ceremonies.   This does not mean, as the dissent suggests, that no judge can now turn down any request to perform a marriage.  What it means is that no judge can turn down a request to perform a marriage for reasons that undermine the integrity of the judiciary by demonstrating a lack of independence and impartiality.  This is no different than allowing parties to exercise the right to peremptory challenges of jurors for any reason, while prohibiting them from challenging jurors on the basis of race or gender.  *See Beartusk v. State*, 6 P.3d 138, 142 (Wyo. 2000); (citing *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).  Depending on her choice, it will be up to the circuit court judge's discretion to determine whether she will continue as a part-time circuit court magistrate.  A part-time circuit court magistrate's position is unique.  Unlike a full-time circuit court magistrate or a circuit court judge, the functions of a part-time circuit court magistrate's job depend upon the particular needs of the circuit court judge appointing the magistrate.  We therefore defer to the circuit court judge who appointed Judge Neely to determine whether she can continue to serve the essential functions of that position.

[¶75]  We decline to remove Judge Neely from her position as a municipal court judge; such a punishment would "unnecessarily circumscribe protected expression," and we are mindful of our goal to narrowly tailor the remedy.

## CONCLUSION

[¶76]  We conclude that Judge Ruth Neely shall receive a public censure; Judge Neely shall either perform no marriage ceremonies or she shall perform marriage ceremonies regardless of the couple's sexual orientation; and each party will bear its own fees and costs.

32

**KAUTZ, Justice**, dissenting, in which, **DAVIS, Justice**, joins.

[¶77] I must respectfully, but vigorously, dissent.

[¶78] This case is of the utmost importance to the State of Wyoming. It is a case confronting new and challenging issues, where the parts of the legal landscape recently changed dramatically and rapidly.[16] Contrary to the position asserted by the majority opinion, this case <u>is</u> about religious beliefs and same sex marriage. The issues considered here determine whether there is a religious test for who may serve as a judge in Wyoming. They consider whether a judge may be precluded from one of the functions of office not for her actions, but for her statements about her religious views. The issues determine whether there is room in Wyoming for judges with various religious beliefs. The issues here decide whether Wyoming's constitutional provisions about freedom of religion and equality of every person can coexist. And, this case determines whether there are job requirements on judges beyond what the legislature has specified.

### Judge Neely's Background

[¶79] The majority opinion summarizes facts from the record. However, in addition to the facts presented by the majority, some additional facts are important to this decision.

[¶80] Prior to this case, Judge Neely has never been accused of prejudice or bias, and has never had a complaint brought against her either before the Commission or the Pinedale town council. Judge Neely has an outstanding record and reputation, being recognized for her fairness and willingness to serve the public. The current Mayor of Pinedale, Bob Jones, who has known Judge Neely for over ten years, states that "she has a sterling reputation in the community as a person of unswerving character and as an honest, careful, and fair judge." After observing her on the bench, Mayor Jones said he "cannot imagine a situation in which she would treat unfairly anyone who appears before her." Former mayor, Miriam Carlson, who also appointed Judge Neely and observed her both while mayor and later while serving on the town council, states "based on my experience watching her operate as a municipal judge, she has always been fair and impartial. In fact, I don't think you could find a fairer person to be a judge."

[¶81] Pinedale town attorney, Ralph E. Wood, has observed Judge Neely during his entire tenure as town attorney – seventeen years. Based on his experience he describes Judge Neely as "a dedicated public servant and an unselfish and generous member of the

---

[16] No other state court has decided this issue. The Washington Commission on Judicial Conduct decided a case consistent with the majority opinion, and advisory committees in Arizona, Nebraska, Wisconsin, Pennsylvania, and Ohio have given advisory opinions. None of those states have the same religious freedom provisions found in the Wyoming Constitution. As can be seen with the Wyoming Commission's decision on Rule 1.1, Commission recommendations may or may not be correct, and are not precedent.

33

community more generally." He unequivocally states that "in my experience, every party who appears before Ruth gets a fair shake, and she has never exhibited even the slightest hint of bias, prejudice or partiality toward anyone." Under oath, Mr. Wood states "based on my experience, Ruth's religious belief regarding marriage and her inability to officiate at same-sex wedding ceremonies does not, and will not, affect in any way her impartiality as a judge."

[¶82] Judge Neely serves on the steering committee of the Sublette County Treatment Court. The coordinator of that agency, Kathryn Anderson, has known Judge Neely since 2006. Ms. Anderson is married to her same sex partner, Ms. Stevens. She is fully aware of Judge Neely's views on same sex marriage, yet describes Judge Neely as a "conscientious, fair, and impartial person." Ms. Anderson states, "I have no doubt that she will continue to treat all individuals respectfully and fairly inside and outside her courtroom, regardless of their sexual orientation. Accordingly, I believe it would be obscene and offensive to discipline Judge Neely for her statement . . . about her religious beliefs regarding marriage."

### What Judge Neely Said and Did

[¶83] On December 5, 2014, Ned Donovan, a reporter from the Pinedale Roundup, called Judge Neely, but she was unable to answer the call. When she called him back, Mr. Donovan identified himself as a reporter and "asked if [she] was excited to be able to start performing same-sex marriages." Judge Neely responded that because of her religious beliefs she would not be able to perform same sex marriages. However, she affirmed that others could and would perform same sex marriages. Mr. Donovan wrote an article about the conversation, concluding "Neely, however, was clear that this does not stop any same sex couple in Pinedale from getting married in the town." Judge Neely added that she had never been asked to perform a same sex marriage.

[¶84] About twenty minutes after that conversation, Judge Neely called Mr. Donovan back and asked that he substitute her earlier statements with the following: "When law and religion conflict, choices have to be made. I have not yet been asked to perform a same-sex marriage." Mr. Donovan called Judge Neely back a few hours later and offered to not publish a story if Judge Neely would state a willingness to perform same-sex marriages. Judge Neely declined, and on December 9, 2014, a local newspaper published an article written by Mr. Donovan which included Judge Neely's statements from both conversations.

[¶85] No one ever asked Judge Neely to perform a same sex marriage, and Judge Neely never refused such a request.

[¶86] Under oath, Judge Neely said "if I ever were to receive a request to perform a same-sex marriage, which has never happened, I would ensure that the couple received

the services that they requested by very kindly giving them the names and phone numbers of other magistrates who could perform their wedding." Further, also under oath, Judge Neely stated that if any case before her "would ever require me to recognize or afford rights based on a same-sex marriage . . . I would unquestionably recognize that marriage and afford the litigant all the rights that flow from it. . . . I have never disputed the legality of same-sex marriage."

[¶87] The record has no indication that any same sex couple has been denied or delayed marriage in Pinedale. Mr. Wood, who is able to perform marriages as a district court commissioner and as a circuit court magistrate, states "there is no shortage of public officials in Pinedale or Sublette County willing to officiate at same-sex wedding ceremonies." He indicated that he is willing to perform such marriages and has done so.

## DISCUSSION

[¶88] Accusations that a judge violated the Code of Judicial Conduct are akin to criminal charges, and the most serious incriminations that can be leveled at a judge. Analysis of whether a judge violated a specific rule in the Code should be exact, just as it is with criminal charges. The public can be confident in its judiciary only if the Code is accurately applied to every judge, without watering down the requirements therein, but also without overreaching beyond the specific language in the rules.

### 1. Did Judge Neely violate Rule 1.1 of the Wyoming Code of Judicial Conduct?

[¶89] The majority opinion concludes that the record does not indicate that Judge Neely violated Rule 1.1. I concur.

[¶90] Before specifically addressing the other Rules the majority finds Judge Neely violated, it is necessary to analyze exactly what "the law" requires of Judge Neely and other Wyoming judges with respect to officiating at marriages.

[¶91] The majority opinion asserts that Judge Neely failed or refused to follow the law as established in *Guzzo v. Mead,* No. 14-CV-SWS, 2014 WL 5317797 (D. Wyo. Oct. 17, 2014). *Guzzo* is clear about the law it establishes. It states:

> Defendants (essentially State and County Officials) are hereby enjoined from enforcing or applying Wyoming Statute § 20-1-101, or any other state law, policy, or practice, as a basis to deny marriage to same-sex couples or to deny recognition of otherwise valid same-sex marriages entered into elsewhere. Marriage licenses may not be denied on the basis that the applicants are a same-sex couple.

*Id.* at 8.

[¶92]  *Guzzo* established that Wyoming officials (which would include judges) may not deny marriage to same sex couples on the basis of any state law, policy or practice.  It did not establish any law beyond this specific prohibition.  It is clear from the undisputed facts that Judge Neely did not deny marriage to anyone, nor did she say she would deny marriage to anyone.  Rather, she said that because of her religious beliefs, she would not perform same sex marriages herself, but would assist couples in finding a judge who would.  *Guzzo* did not involve statements about religious beliefs in any manner.  It did not involve any issue of who must perform same sex marriages.  *Guzzo* certainly did not establish any requirement that any particular judge or level of judges in Wyoming must perform every marriage when requested.  Similarly, it did not establish any right of same sex couples to insist that they be married by a particular judge.

[¶93]  In addition to *Guzzo,* the majority finds applicable law in the U.S. Supreme Court's decision in *Obergefell,* 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015).  That case also is clear about the law it establishes (as it applies to the issues here).  The Court stated "[t]he Constitution, however, does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex."  *Id.* at 2607.  *Obergefell* did not establish any law about who must perform those marriages, but only said they must be available on the same terms as accorded to other couples.  Because other couples in Wyoming cannot insist that a particular judge or magistrate perform their wedding ceremony, it follows that same sex couples also have no right to do so.  In *Obergefell* the U.S. Supreme Court made some other clear statements that apply to this case.  It stated "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here."  *Id*. at 2602.  It added:

> Finally, it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.

*Id*. at 2607.

[¶94]  The majority's decision implies that the law requires Judge Neely to perform weddings, and that Judge Neely did not "follow" the law when she made the reported

statements. Indeed, a key element in the majority opinion is an assumption that to follow the law Judge Neely was required to perform all marriages, or at least all same sex marriages, when requested. Neither *Guzzo* nor *Obergefell* created such a requirement. Wyoming law does not contain such a requirement. Wyo. Stat. Ann. § 20-1-106(a) (LexisNexis 2015) governs who may perform marriages in Wyoming. It says:

> Every district or circuit court judge, district court Commissioner, supreme court justice, magistrate and every licensed or ordained minister of the gospel, bishop, priest or rabbi, or other qualified person acting in accordance with traditions or rites for the solemnization of marriage of any religion, denomination or religious society, may perform the ceremony of marriage in this state.

[¶95] This statute indicates that many judges and religious officials **may** perform weddings, but it does not give that authority to municipal judges. Further, this statute states that certain judges and other individuals **may** perform the marriage ceremony, but it does not require any judge to do so. Nothing in any other statute or rule requires any particular judge or individual to perform a marriage ceremony.

[¶96] It cannot be argued that Judge Neely had an implied duty to perform marriages if asked. If there is an implied duty for circuit judges or circuit court magistrates to perform all weddings when requested, then there likewise is a duty for district court judges, Supreme Court justices, ministers, bishops, priests, rabbis and others. Of course, there simply is no such duty based on the plain language of § 20-1-106(a). The legislature, not this Court, wrote § 20-1-106(a) and determines who can perform marriages and whether any particular class of officiant is required to do so. It is not appropriate for this Court to attempt to re-write this statute. *Horning v. Penrose Plumbing & Heating, Inc.,* 2014 WY 133, ¶ 18, 336 P.3d 151, 155 (Wyo. 2014) ("We are not at liberty to rewrite a statute under the guise of statutory interpretation or impose a meaning beyond its unambiguous language.").

[¶97] Further, nothing in Wyoming law or the record supports any express or implied requirement that if a judge decides to perform any weddings, he or she must perform every wedding. The record contains evidence that magistrates and judges decline to perform legal marriages for a variety of reasons. Magistrates who perform some marriages decline to perform others because they have family commitments, have other things to do, prefer to watch a football game, or prefer to perform weddings only for friends. Wyoming judges may or may not perform weddings without regard to the reason for their decision.

37

[¶98] Simply put, the law does not require any Wyoming judge, including part-time magistrate Neely, to perform any marriage ceremony.[17] The applicable law only requires that state officials may not "deny marriage to same-sex couples."

[¶99] The evidence does not indicate that Judge Neely ever denied a same sex couple marriage. It does not indicate that Judge Neely ever said she would deny marriage to a same sex couple if asked. To the contrary, she clearly stated that she recognized their right to be married. Judge Neely did not hinder or delay any same sex couple seeking to be married, and she did not indicate any intent to do so. There simply is no evidence in the record indicating that Judge Neely failed to comply with the law or said she would not follow the law.

## 2. *Did Judge Neely violate Rule 1.2 of the Wyoming Code of Judicial Conduct?*

[¶100] Rule 1.2 of the Wyoming Code of Judicial Conduct states that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." The Code defines "impartiality" as "the absence of bias or prejudice in favor of, or against, particular parties or classes of parties. Comment [5] to this rule states that "the test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament or fitness to serve as a judge."

[¶101] The majority opinion accepts the Commission's recommendation on Rule 1.2. The Commission explained the basis for its conclusion that Judge Neely violated Rule 1.2 by stating:

> Here, Judge Neely announced she would not follow the law because of her religious convictions regarding same sex marriage. By announcing her position against same sex marriage and her decision not to perform said marriages, she has given the impression to the public that judges, sworn to uphold the law, may refuse to follow the law of the land. She has also suggested by her statements that other citizens may

---

[17] Sound policy reasons support magistrates having discretion in exercising their marriage-celebrant authority. They are not paid by the state for performing marriages, but instead must negotiate their own fee with the participants. Magistrates are sometimes appointed to perform just a particular wedding – to act for their own private purposes. Unlike other functions of a magistrate, they personally participate in celebrating a private event. Considering these factors, it makes sense that the legislature found it appropriate to authorize many levels of judges to perform weddings, while giving each judge the discretion to decide for or against participating in any specific wedding.

follow her lead. A judge announcing her decision to pick and choose the law she wishes to follow undermines her position and our system of justice.

[¶102] The majority's position that Judge Neely violated Rule 1.2 is based on the mistaken conclusion that Judge Neely refused "to follow the law of the land." As discussed above, the undisputed evidence shows that Judge Neely made no such refusal. She did not state that she would deny marriage to same sex couples, but rather said she would assist such couples in finding someone to perform their civil marriage ceremony. The law does not require Judge Neely personally to perform every marriage. There is no clear and convincing evidence in the record that she made a decision to "pick and choose the law she wishes to follow" or that she would "refuse to follow the law of the land." As discussed above, the record is devoid of evidence that Judge Neely refused to follow any law. Nothing about what Judge Neely said remotely indicates that she will "pick and choose the law she wishes to follow."

[¶103] The majority's conclusion on Rule 1.2 is an overreach, just as the Commission's position on Rule 1.1 was. The standards in Rule 1.2 are vague, and require appropriate caution and reasonableness from the Court when applying them. Here the majority opinion goes "too far" in attempting to find appearances of impropriety or lack of independence. It concludes that Judge Neely's statements erode public confidence in the judiciary without any evidentiary or logical support for that conclusion.

[¶104] To maintain public confidence in the judiciary, it is necessary to carefully apply vague rules like these. On the one hand, application of the standards "must be appropriately demanding to the end that justice is facilitated in every possible way. At the same time the standards must ensure that the judges are not unnecessarily separated from the communities they serve in straitjackets of judicial isolation." Robert B. McKay, *The Judiciary and Nonjudicial Activities,* 35 Law and Contemporary Problems L.J. 9 (1970). When the rule uses vague standards, such as those in Rule 1.2, "*we must fear not only unreasonable discipline, but also discipline that produces an undesirable in terrorem effect* on judges' moral and social lives." Steven Lubet, *Judicial Impropriety: Love, Friendship, Free Speech, and Other Intemperate Conduct*, 1986 Ariz. L.J. 379, 399. The majority opinion does just that, by sending messages to both the public and judges that (1) every Wyoming judge who is willing to perform any marriage must perform same sex marriages when requested or risk being found to have violated the WCJC, and (2) no person holding a sincere religious belief opposing same sex marriage may be a Wyoming judge who performs marriages.

[¶105] Rule 1.2 requires Judge Neely to act "in a manner that promotes confidence in the independence, integrity and impartiality of the Judiciary." It further requires her to "avoid impropriety and the appearance of impropriety." Whether Judge Neely violated this part of Rule 1.2 hinges on the perceptions of a reasonable member of the public, who

must determine whether Judge Neely's statements create an appearance of impropriety or undermine the public's perception of her impartiality when deciding cases. The majority opinion appropriately notes Comment [5] to this rule which specifies that "the test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." Then, the majority concludes that clear and convincing evidence in the record would so persuade a reasonable person. The sole evidence the majority opinion uses to support its conclusion is "her stated refusal to conduct marriages for homosexuals."

[¶106] Although the majority opinion claims otherwise, it applies its own, and the Commission's, subjective test in concluding that Judge Neely violated Rule 1.2. This correct test is an objective one, not a subjective one. Arthur Garwin, et al., *Annotated Model Code of Judicial Conduct,* 61 (2d ed. 2011).

[¶107] The test for determining what constitutes "the appearance of impropriety" and what "promotes (or denigrates) confidence in the . . . impartiality of the judiciary" necessarily must be an objective test based on what a rational person would think knowing all of the circumstances. The use of any lesser standard leads to absurd results. For example, the test cannot be whether some individual subjectively might be offended by what he or she heard or saw. Given the almost limitless capacity for people to take offense or feel "unwelcome," this would put every judge constantly at risk of being brought before the Commission to face ethics charges. Similarly, the test cannot be based on what someone would think knowing only some of the circumstances. A rational person is not rational if he or she draws conclusions based on inadequate facts. Unhappy litigants always would be able to base claims of judicial impropriety or favoritism on just the portion of the facts that supported their side. Such subjective tests would seriously impair a judge's ability to make independent decisions based on the facts and the law. The majority opinion is based on such a subjective analysis. It is based on a subjective thought that circuit court magistrates have a duty to perform marriages when requested (which they do not) and on a subjective thought that someone hearing the misleading presentation of Judge Neely's request to the advisory commission would question her impartiality.

[¶108] The "appearance of impropriety" and "promotes confidence in the … impartiality of the judiciary" language in this rule is analogous to the language found in Rule 2.11 which governs disqualification of judges. Cases decided under both rules, and under corresponding federal statutes, indicate that a reasonable person would look at the particular facts of a case, and the totality of the circumstances when determining whether a judge's actions adversely reflect on the judge's impartiality. For example, Nebraska examines whether "a reasonable person **who knew the circumstances of the case** would question the judge's impartiality under an objective standard of reasonableness." *Tierney v. Four H Land Co. Ltd. P'ship*, 798 N.W.2d 586, 592 (Neb. 2011) (emphasis added).

Alaska applies this principle by first viewing "**all of the facts**" in the judge's favor, and then determining whether **"the totality of the circumstances** surrounding (the judge's) decision . . . create(d) an unmistakable appearance that something improper was afoot." *In re Johnstone*, 2 P.3d 1226, 1236 (Alaska 2000). The 7th Circuit said that "the test for an appearance of partiality is, . . ., whether an objective, disinterested **observer fully informed of the facts** underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case." *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir. 1985) (emphasis added). Mississippi held that "the test for impropriety is whether a judge's impartiality might be questioned by **a reasonable person knowing all the circumstances**." *Mississippi Comm'n on Judicial Performance v. Boland*, 975 So.2d 882, 895 (Miss. 2008) (emphasis added). The Pennsylvania Supreme Court capably expounded on the requirement that the reasonable person standard be based on a reasonable person with knowledge of all the facts and circumstances, and quoted former U.S. Chief Justice Rhenquist. It said:

> We cannot agree, however, with the suggestion that the appearance be gauged as to a misinformed or uninformed hypothetical reasonable person. The absurdity of such a standard was ably and cogently exposed by, then, Justice Rehnquist as follows:
>
>> It is, of course, possible to interpret the phrase "appearance of impropriety" much more broadly and to suggest that it embraces a situation *where the facts are only partially known,* and where this partial version of the facts might rouse legitimate suspicion. Suppose, for example, that it was known only that Judge Haynsworth had *some* stock in the litigant, without it being known how miniscule his interest was? *But this interpretation would cut so broadly as to prevent a judge named Jones from presiding at the trial of a defendant named Jones, even though they were totally unrelated, since it would be possible from simply reading the docket entries to conclude that they were related to one another.* It will not do.
>
> Rehnquist, *supra,* 28 The Record at 701. (Emphasis added).
>
> Indeed, if appearances were gauged without reference to the full and true facts, then false appearances of impropriety could be manufactured with ease by anyone with personal or political *animus* toward a judge. If such were the case, then the hope of an independent judiciary would have been less

41

than an evanescent dream, it would have been cruel charade and a dangerous snare for an ethical and unsuspecting judiciary.

Fortunately, our case law is squarely to the contrary. In *In re Greenberg (II),* 457 Pa. 33, 318 A.2d 740 (1974), our Supreme Court stated succinctly, "it is our duty to consider the totality of the circumstances when determining questions pertaining to professional and judicial discipline." 318 A.2d at 741. (Emphasis added).

Numerous cases would undoubtedly have been decided differently if the totality of the circumstances were *not* considered, and instead the Board and our Supreme Court applied a reasonable *mis* informed or *un* informed person standard. A judge's acceptance of a gift from a union leader might create a distinct appearance of impropriety, if our hypothetical reasonable *un* informed person did not know of their long familial association, or that the judge had systematically recused himself from any case known to involve a member of the gift donor's union. *See Matter of Braig, supra.* Likewise, an appearance of impropriety might certainly appear if one had neither the benefit of the respondent's version of disputed facts, nor knowledge of the respondent's excellent reputation as an ethical individual and respected jurist. *See Matter of Sylvester, supra.* Moreover, an appearance of impropriety might certainly appear in hindsight based upon facts not known at the time of a judge's challenged conduct, or based upon only one version of disputed facts, which would not appear if the limits of the judge's information at the time of the conduct and the other side of the story were considered. *See Matter of Johnson, supra.*

*In re Larsen*, 532 Pa. 326, 433-34, 616 A.2d 529, 583 (1992)

[¶109]   A reasonable person with knowledge of all the facts would know that Judge Neely was never asked to perform a same sex marriage, and had never refused such a request.  He or she would know that all who work with her have expressed unreserved confidence that she will be absolutely fair and impartial to all litigants, whatever their sexual preference.  Such a reasonable person would know that Wyoming law does not require Judge Neely to perform any marriage.  He or she would know that the law prohibits judges and other public officials in Wyoming from denying marriage to same

42

sex couples, and no same sex couple has been denied marriage by or because of Judge Neely's statements. Further, a reasonable person would know that there is no indication that any same sex couple is likely to be denied or delayed in obtaining a civil marriage because of Judge Neely's statements or religious beliefs. A reasonable person would know that if asked to perform such a marriage, Judge Neely would assist in finding an appropriate officiant, and that there is no shortage of such officiants. A reasonable person, apprised of these facts, could not conclude that Judge Neely's statements gave the appearance of impropriety nor that they eroded public confidence in the impartiality of the judiciary. To the contrary, a reasonable mind would conclude, as Ms. Anderson did, "it would be obscene and offensive to discipline Judge Neely for her statement . . . about her religious beliefs regarding marriage."

[¶110] Rule 1.2 presents an important requirement that judges act in a manner which promotes public confidence in the judiciary. The record in this case indicates that Judge Neely did just that – she promoted confidence in the integrity and impartiality of the judiciary. Based on Judge Neely's statements, the public in Wyoming can be confident that Judge Neely does not intend to "pick and choose" which law she wants to follow, but, rather, she will comply with the law about same sex marriage. She would not work against or frustrate a requested same-sex marriage. Based on Judge Neely's statements, the public in Wyoming can be confident that she respects and treats every person before her court fairly, and is not biased.

[¶111] The record does not contain clear and convincing evidence that Judge Neely violated Rule 1.2.

### 3. Did Judge Neely violate Rule 2.2 of the Wyoming Code of Judicial Conduct?

[¶112] The majority opinion concludes that Judge Neely also violated Rule 2.2. That rule states "[a] judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." The majority believes Judge Neely expressed intent to act unfairly because it finds "she is willing to do that (perform marriages) for one class of people (opposite-sex couples), but not for another (same-sex couples)." However, the record does not show that Judge Neely would perform all marriages for any class of people.

[¶113] The majority position ignores the plain language of this rule. The rule, by its terms, applies only to actions, not to statements made outside the context of a case or an actual request. The words "uphold," "apply" and "perform" all relate to action or deliberate inaction by a judge. They simply cannot apply to a judge's statement about how her religious views would come into play in the event at some unknown, future time, some unknown same sex couple insisted that Judge Neely, rather than someone else, perform their marriage. Although the majority claims that this "action against Judge

43

Neely is a response to her deeds, not her faith," the opposite is true. Judge Neely took no action, and was never involved in a "deed" which denied anyone a marriage.

[¶114] Furthermore, the rule requires judges to perform "duties" fairly and impartially. As discussed above, no judge in Wyoming has a duty to perform any particular marriage. Because no couple seeking marriage has a right in Wyoming to insist that a particular judge perform the ceremony, it is not "unfair" or "partial" for Judge Neely to arrange for some other judge to officiate for a same sex couple. Using the majority logic about this rule it would be a violation of Rule 2.2 fairness and impartiality for any judge to decline to perform a wedding if they would perform a wedding for anyone else. The majority position creates a requirement that does not exist in Wyoming—that judges who perform some marriages must perform all marriages.[18]

[¶115] If the law, or Judge Neely's job description, required her to perform every marriage when requested, and if a same sex couple actually demanded that she perform their marriage ceremony, and if Judge Neely then denied them a civil marriage ceremony, then she may have violated Rule 2.2. However, none of those facts exist here.

[¶116] *Guzzo* established a "duty" for state officials in the negative sense – they may not deny marriage to same sex couples. Even if Judge Neely's statements were seen as actions subject to Rule 2.2, she did not indicate she would violate that duty or carry it out unfairly with bias. Based on those statements, every couple requesting to be married would receive a marriage, no matter what their gender or sexual preference. Because there is no legal difference between marriage ceremonies conducted by one judge as opposed to another, and because no law permits any couple to insist that a particular judge or magistrate or clergy perform their marriage ceremony, Judge Neely's statements do not indicate any lack of fairness or impartiality. The record does not contain clear and convincing evidence that Judge Neely violated Rule 2.2 by her statements.

4. **Did Judge Neely violate Rule 2.3(B) of the Wyoming Code of Judicial Conduct**?

[¶117] Rule 2.3(A) states "a judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice." The Commission did not find that Judge Neely violated Rule 2.3(A), apparently recognizing that this rule applies to actions as opposed to statements about what would occur in hypothetical circumstances. The majority and the Commission, however, conclude that clear and convincing evidence indicates Judge Neely violated Rule 2.3(B), which states:

---

[18] The majority suggests that the results here are similar to the results in jury selection from *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), which held that jurors could not be challenged solely on the basis of race or gender. There are many, many differences between the effect of *Batson* and the effect of the majority opinion.

A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the Judge's direction and control to do so.

[¶118] Analysis of whether Judge Neely's statements violated Rule 2.3 requires accurate definitions of the terms "bias" and "prejudice." We have generally defined bias as "a leaning of the mind or an inclination toward one person over another. "The 'bias' . . . must be personal, and it must be such a condition of the mind which sways judgment and renders the judge unable to exercise his functions impartially in a given case or which is inconsistent with a state of mind fully open to the conviction which evidence might produce." *Eaton v. State*, 2008 WY 97, ¶ 78, 192 P.3d 36, 73 (Wyo. 2008); *Brown v. Avery*, 850 P.2d 612, 616 (Wyo. 1993).

[¶119] W.R.C.P. 40.1(b)(2)(E) uses these same terms in defining when a judge is disqualified from sitting on a case "for cause."[19] We defined bias and prejudice as used in that rule as: "Prejudice involves a prejudgment or forming of an opinion without sufficient knowledge or examination. Bias is a leaning of the mind or an inclination toward one person over another. The 'bias' which is a ground for disqualification of a judge must be personal." *TZ Land & Cattle Co. v. Condict*, 795 P.2d 1204, 1211 (Wyo. 1990), quoting *Cline v. Sawyer,* 600 P.2d 725, 729 (Wyo.1979). To find bias or prejudice resulting in disqualification of a judge, "[s]uch conditions must exist which reflect prejudgment of the case by the judge or a leaning of his mind in favor of one party to the extent that his decision in the matter is based on grounds other than the evidence placed before him." *Id.,* quoting *Pote v. State,* 733 P.2d 1018, 1021 (Wyo. 1987).

[¶120] Using these definitions, Judge Neely would have manifested bias if her statements demonstrated an inclination of her mind toward one person over another in such a manner that sways her judgment and renders her unable to exercise her functions impartially in a given case. She would have manifested prejudice if she engaged in prejudgment or forming of an opinion without sufficient knowledge or examination.

[¶121] Judge Neely's statements contain no indication of bias or prejudice under these definitions. The statements are only an indication of her religious belief about marriage. They do not demonstrate any inclination of Judge Neely's mind for or against persons in

---

[19] W.R.C.P. 40.1 recognizes that judges are human beings and may have personal biases and prejudices. When a judge has a bias or prejudice, the rule provides a means for the judge to be recused from that case, and assign the case to a different judge. The judge's bias or prejudice, however, does not disqualify him or her from being a judge altogether.

same sex relationships. To the contrary, Judge Neely said that she would assist such a couple in finding an officiant, and that she would treat them the same as any other person in any court proceeding. Nothing in her statements indicates a prejudgment or inclination against persons in same sex relationships.

[¶122] A judge is guilty of expressing bias or prejudice by statements which denigrate the human value or standing of a person based on the fact that they fit within a particular class of persons. Comment [2] to Rule 2.3 gives examples: "epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; and irrelevant references to personal characteristics." Such statements truly do "impair the fairness of the proceeding and bring the judiciary into disrepute." Comment [1] to Rule 2.3. However, Judge Neely's statements did not include any indication of such denigration. To the contrary, Judge Neely's statements and all the other evidence in the record indicate that Judge Neely does not and will not engage in bias or prejudice in any judicial proceeding.

[¶123] The record does not contain clear and convincing evidence that Judge Neely violated Rule 2.3(B).

[¶124] The Commission asserted that because Judge Neely's religious beliefs oppose same sex marriage, she necessarily is biased and prejudiced against persons who might be in a same sex marriage or relationship. Likewise, the majority opinion states that "Judge Neely's refusal to perform same sex marriages exhibits bias and prejudice toward homosexuals." There simply is no logic supporting this position. Judge Neely's religious belief about who may be married has no relationship to her view of the worth of any individual or class of individuals. The overwhelming evidence in the record indicates that Judge Neely does not hold any bias or prejudice against any person or class of persons.

[¶125] The majority opinion hinges on its conclusions that Judge Neely's statements would cause reasonable persons to question her impartiality, and would conclude she exhibited bias and prejudice toward homosexuals. Those are not conclusions that would be reached by a reasonable person apprised of the appropriate facts.

### 5. The Wyoming and U.S. Constitutions

[¶126] In addition to carefully analyzing the specific Rules in the WCJC that have been applied to this case, it is appropriate to review relevant portions of the Wyoming and U.S. Constitutions. Any construction and analysis of the Rules should be done in a manner consistent with those Constitutional provisions.

46

[¶127] Wyoming has a rich foundation for and history of protecting both free speech, equality before the law, and religious freedom. Article 1 of the Wyoming Constitution enumerates individual rights that our state government must respect, including the following:

> **§ 2. Equality of all**. In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal.
>
> **§ 3. Equal political rights**. Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever … .
>
> **§ 18. Religious liberty**. The free exercise and enjoyment of religious profession and worship without discrimination or preference shall be forever guaranteed in this state, and no person shall be rendered incompetent to hold any office of trust or profit, or to serve as a witness or juror, because of his opinion on any matter of religious belief whatever; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state.
>
> **§ 20. Freedom of speech** … . Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; … .

[¶128] Other portions of the Wyoming Constitution also address civil and religious freedom:

> **Preamble.** We, the people of the State of Wyoming, grateful to God for our civil, political and religious liberties, and desiring to secure them to ourselves and perpetuate them to our posterity, do ordain and establish this Constitution.
>
> **Ordinances**. The following article [sections] shall be irrevocable without the consent of the United States and the people of this state:
>
> **Art. 21, § 25**. **Religious liberty.** Perfect toleration of religious sentiment shall be secured, and no inhabitant of this

state shall ever be molested in person or property on account of his or her mode of religious worship.

[¶129]    The U.S. Constitution includes well-known protections for equality and individual freedoms:

> **Amendment 1.**  Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

> **Amendment 14, Section 1.**  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[¶130]    Each of these enumerations of individual rights is vitally important to us. Together, they recognize the value of every person, and confirm that free individuals are the essence of our society.  If any of these individual rights is diminished, individual value and freedom are diminished.  If any of these individual rights is diminished, the public's confidence in the judiciary is at risk.  Judges, along with every other person, enjoy each of these constitutional rights.

[¶131]  The *Obergefell* and *Guzzo* decisions are based on equality and equal protection. The majority opinion is based on an assumption that to carry out *Obergefell* and *Guzzo,* other individual rights, including religious liberty and freedom of speech, must be curtailed.  The majority opinion states that we must choose between public confidence in the judiciary by implementing *Obergefell* and *Guzzo,* and recognizing constitutionally guaranteed rights to free exercise of religion and speech.  Analysis of these constitutional principles, however, shows that Wyoming, the Equality State, can equally recognize each of these individual rights.  It is not appropriate, nor necessary, to diminish religious liberty or free speech in Wyoming to accomplish protection of individual rights connected with same sex marriage, or to assure the integrity of the judiciary.

### A.  Article 1, § 18 of the Wyoming Constitution.

[¶132]  The Wyoming Constitution is particularly strong in its protection of religious freedom.  The Constitution's preamble identifies religious liberty as a motivation for establishing the Constitution.  Article 21, § 25 of our Constitution reaffirms the right to religious freedom, and includes that right with the most security, providing that it could

only be repealed with the consent of Congress. In addition, the primary guarantee of religious liberty in Wyoming, Article 1, § 18, is almost unique among the states in its strength. It is located in the Declaration of Rights section of the Constitution, which requires that it be construed liberally to protect individual liberty. *Vasquez v. State,* 990 P.2d 476, 485 (Wyo. 1999) (quoting Robert B. Keiter and Tim Newcomb, *The Wyoming State Constitution, A Reference Guide* 11-12 (1993)).

[¶133] Article 1, § 18 establishes several very specific, strong principles which are applicable to this case. It begins by stating that "the free exercise and enjoyment of religious profession" shall be "forever guaranteed in this state." It guarantees that any person can hold "any office of trust" regardless of "his opinion on any matter of religious belief whatever." Finally, this section restricts limitations on religious freedom in Wyoming to very specific, narrow circumstances.

[¶134] Four aspects of this constitutional language are noteworthy. First, by guaranteeing "the free exercise" of religion, this provision of the Wyoming Constitution protects not just religious beliefs, but the exercise of those beliefs through action and abstention. *In re LePage,* 18 P.3d 1177, 1181 (Wyo. 2001). The "exercise of religion" includes "the performance of (or abstention from) physical acts." *Employment Div. v. Smith,* 494 U.S. 872, 877 (1990).

[¶135] Second, unlike the U.S. free exercise clause, which simply attempts to restrain governmental action, Wyoming's Constitution expressly grants affirmative rights to the free exercise of religion. While the federal constitution restricts government from prohibiting religious exercise, the Wyoming Constitution "forever guarantees" freedom of religious exercise.

[¶136] Third, this statement in our Constitution goes far beyond the U.S. Constitution in protecting service in public office. While Article VI of the U.S. Constitution bans "religious test[s]" for public office, our Constitution prohibits **any** government action that renders **any** person incompetent from holding "**any** office of trust" based on "**any** matter of religious belief **whatever**." (Emphasis added). In Wyoming, persons are protected not just from the narrow test oaths often imposed when our country was founded, but from any type of disqualification from office based on religion.

[¶137] Finally, our Constitution states that guarantees of religious freedom are limited only in that they cannot justify "acts of licentiousness" or a threat to "the peace or safety of the state." This portion of Article 1, § 18 shows that the guarantee of free exercise of religion in Wyoming is not limited to belief and expression, but includes actions or abstention. Otherwise, there would have been no need to state that some actions are not protected. Further, when this last statement in Article 1, § 18 specifies that certain "permissible countervailing interests of the government" may "outweigh religious liberty," the possibility that other interests might also outweigh religious liberty is

49

foreclosed. *See State v. Hershberger,* 462 N.W.2d 393, 397 (Minn. 1990) (construing identical language).

[¶138]   The history and proceedings of our state's constitutional convention are "a valuable aid in interpreting the scope of a provision of the state constitution." *Dworkin v. L.F.P., Inc.,* 839 P.2d 903, 910 (Wyo. 1992).   Before adopting the broad free exercise provision we have in our Constitution, the Wyoming constitutional convention rejected much weaker language, which limited protection of religious freedom to "matters of religious sentiment, belief, and worship," and which protected public officeholders solely from being forced to meet "religious qualification[s]." *Journal and Debates of the Constitutional Convention of the State of Wyoming* 168.   Clearly, Article 1, § 18 provides greater protection than what was included in the rejected language.

[¶139]   The majority opinion finds that Article 1, § 18 does not apply here because, it claims, its decision is not based in any manner on Judge Neely's religious beliefs, but instead on her unwillingness to do what the majority opinion perceives is her duty as a magistrate.   The majority opinion states "the action against Judge Neely is in response to her deeds, not her faith."

[¶140]   The record is clear, however, that Judge Neely only made statements – nothing more.   Everything Judge Neely said is based solely and entirely on her sincerely held religious belief.   Her statement that if asked, she would decline personally to officiate at a same sex marriage but would find someone else who would do so is exclusively an expression of her opinion on a matter of religious belief.   In spite of the claims to the contrary, it is clear from the record that the majority opinion (and the Commission's recommendation) holds her "incompetent to hold … office" because of her expression of her "opinion on … [a] matter of religious belief."   The office of circuit court magistrate includes the authority to perform marriages.   The result in this case holds Judge Neely incompetent to hold that function of office unless she compromises her religious convictions.   The conclusions of the majority chip away at the heart of Article 1, § 18 of the Wyoming Constitution.

[¶141]   Further, the majority's claim that findings against Judge Neely are based on her inability to apply and follow the law and on her display of bias rather than on her religious beliefs is not supported by the law or the record.   The law does not require Judge Neely to perform any particular wedding ceremony, and she has never denied or hindered a same sex marriage in any way.   If the law required Judge Neely, as a magistrate, to personally perform every marriage when asked, even allowing for scheduling difficulties, and if someone actually attempted to force her to personally perform their marriage rather than having a different officiant, or if she refused to perform same sex marriages because she held personal animosity or disrespect for the parties, then the claims against Judge Neely might have substance.   None of those facts exist here.

50

[¶142] Article 1, § 18's protection of the free exercise and enjoyment of religious profession is very broad, but does not apply to "acts of licentiousness" or "practices inconsistent with the peace or safety of the state." The record is devoid of even any hint that Judge Neely's expressions constituted "acts of licentiousness" or were "inconsistent with the peace or safety of the state." Wyoming's Constitution (and the U.S. Constitution) guarantees the free exercise of religion, not just the freedom to "believe." It cannot seriously be argued that Judge Neely was free to believe what she wanted, but that the state is permitted to prohibit her from acting consistently with that belief. Under our Constitution the state may restrict her actions based on religious beliefs only when they are "licentious" or "inconsistent with the peace or safety of the state." Under the U.S. Constitution, government can restrict religiously motivated action only where there is a compelling state interest and the state utilizes the least restrictive means to support that interest (as discussed below).

[¶143] The effect of the majority opinion is concerning for the people of Wyoming. It likely results in a religious test for who may be a judge, at any level, in our state. There is only a single statute granting judges and others the authority to perform marriages in Wyoming. Apparently from that statutory authority the majority concludes that a circuit court magistrate who is willing to perform any marriages must perform all same sex marriages when requested. If such a duty exists for circuit court magistrates, it exists for all other judges as well. To avoid ethics charges like these, judges then must pass a religious test indicating that they have no religious beliefs that would prevent them from performing same sex marriages, or be precluded from performing any marriages. The record points out, and *Obergefell* confirms, that a significant portion of our country holds sincere religious views against same sex marriage. The majority position likely would exclude a significant portion of our citizens from the judiciary, without any compelling reason to do so.

[¶144] In addition, the majority opinion is concerning for Wyoming in its treatment of constitutional protections for the free exercise of religion. It finds justification to entirely restrict Judge Neely's "exercise" of her religious beliefs because the majority opinion believes someone might question her independence or impartiality, although the evidence does not support such a conclusion. This reduces the constitutional guarantee of a robust principle – "free exercise" – to a minimal "free belief."

## B. Amendment I to U.S. Constitution.

[¶145] **Free exercise of religion.** Although the Wyoming Constitution includes stronger freedom of religion language than the U.S. Constitution does, it is appropriate to consider some principles developed under the First Amendment in the context of this case. The U.S. Constitution essentially provides that no government may make or enforce a law which prohibits the free exercise of religion.

[¶146]   Both sides agree that this Court should apply the strict scrutiny standard when considering the U.S. constitutional ramifications of the Commission's recommendations and findings.  Strict scrutiny is used to determine whether a state's actions which impinge on constitutional rights such as free speech or free exercise of religion may stand, or whether they prohibit the free exercise of religion.  To pass strict scrutiny, a state or state actor must "demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest." *City of Boerne v. Flores*, 521 U.S. 507, 534, 117 S. Ct. 2157, 2171, 138 L. Ed. 2d 624 (1997).  Strict scrutiny is the "most demanding test known to constitutional law." *Id.*; *Williams-Yulee v. Florida Bar,* 135 S. Ct. 1656, 191 L. Ed. 2d 570 (2015); *Rep. Party of Minn. v. White,* 536 U.S. 765, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002).  The majority opinion clearly impinges on Judge Neely's right to free exercise of religion (and free speech).  Consequently, because of the strict scrutiny standard, the majority opinion's ban of Judge Neely from performing any marriage is constitutionally valid only if it is the "least restrictive means" of achieving a "compelling state interest." *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 718, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981); *accord Washakie County School District No. One v. Herschler,* 606 P.2d 310, 333 (Wyo. 1980).  One cannot make such a finding here.

[¶147]   The majority opinion finds that there is a compelling state interest in protecting same-sex couples from the perception of bias and partiality, and in fostering public confidence in the judiciary by requiring judges to perform all same sex marriages if they perform any marriages.  While the state does have a compelling interest in assuring that judges follow the law, no law in Wyoming requires a particular magistrate to perform a particular wedding.  No law permits couples to insist that a particular judge or magistrate (or religious official) perform a wedding for them.  As discussed above, Judge Neely did not fail or refuse to comply with any law.  This is not a case like *Miller v. Davis,* 123 F. Supp. 3d 924 (E.D. Ky. 2015), where the state specifically required a county clerk to issue marriage licenses, nor is it like *Moore v. Judicial Inquiry Commission,* 891 So.2d 848 (Ala. 2004), where a judge was accused of refusing to comply with specific requirements in a court order.  This is not a case like those cited in the majority opinion where police officers refused to follow instructions to protect abortion clinics or gambling establishments.  In those cases there was an absolute duty which the officers refused to perform.  That is not the case here.  Absolutely nothing in the record indicates that Judge Neely failed or refused to comply with the law.  The Commission's findings and recommendations, therefore, are not supported by the state's interest in insuring that judges follow the law.

[¶148]   The state also has an interest in assuring that judges do not give valid cause for reasonable persons to question the judge's impartiality.  That interest is broad and vaguely stated, and logically unrelated to the actual facts in this case.  Strict scrutiny requires us to "looked beyond broadly formulated interests justifying the general

52

applicability of government mandates and scrutinize[e] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 430-31, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006). Here, there is no evidence in the record proving that the interest in promoting public confidence in the judiciary is threatened by Judge Neely's statements.

[¶149] Apparently some individuals might find it offensive that Judge Neely said she would decline to personally perform a same-sex marriage and instead would refer them to someone else. There is no compelling state interest in shielding individuals from taking such an offense. A "bedrock principle underlying the First Amendment" is that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive." *Snyder v. Phelps,* 562 U.S. 443, 458, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011). "Government may neither compel affirmation of a repugnant belief, nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities." *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S. Ct. 1790, 1793, 10 L. Ed. 2d 965 (1963).[20]

[¶150] The state has a compelling interest in assuring that every person is treated equally and that judges do not display bias or prejudice. This interest comes into play when a judge demonstrates actual bias or partiality. Nothing in the record indicates any bias or prejudice on the part of Judge Neely, so the majority opinion cannot be supported on the basis of this state interest. To assure that judges do not display bias or partiality, our rules permit a judge to assign a particular case to another judge. That is just what Judge Neely proposed to do. Her proposal to refer same sex marriages to another judge cannot be a demonstration of bias, absent any obligation to personally perform such wedding ceremonies.

[¶151] Even if Judge Neely violated a compelling state interest in providing same sex marriages, to protect her constitutional rights the law requires the Commission to recommend or the Court to find the least restrictive alternative to accomplish that interest. If a less restrictive alternative would serve the government's purpose, "the legislature must use that alternative." *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000). To make this showing, the government must "prove" that no other approach will work, *id* at 816, 120 S. Ct. at 126, and must "refute … alternative schemes suggested by the plaintiff." *Yellowbear v. Lampert,* 741 F.3d 48, 62 (10th Cir. 2014). The record does not show that anyone has been denied same sex marriage in Wyoming since *Guzzo* and it does show there are sufficient persons available to perform same sex marriages in Judge Neely's jurisdiction. The remedy of

---

[20] In footnote 11 the majority suggests that if some other type of religious belief were involved or if some other type of prospective married couple were involved there "would be little controversy regarding her (Judge Neely's) discipline." Neither the hypothetical religion nor the hypothetical couple suggested by the majority are appropriately analogized to this case, and the assumed conclusion is likely incorrect.

prohibiting her from performing any marriages is entirely unnecessary to see that the dictates of *Guzzo* are carried out. The majority opinion claims that letting Judge Neely "opt out" of same sex marriages would not work because it conflicts with the interests of the state in having an impartial judiciary and could result in no judge who was willing to perform same sex marriages. The evidence shows otherwise. Further, the availability of marriage officiants is an issue for the legislature, not this Court nor the WCJCE.

[¶152] Similarly, if Judge Neely violated a compelling state interest in assuring the appearance of impartiality, the state simply could require what Judge Neely already stated her intention to do – find another judge to handle same sex marriages.

### C. Free Speech.

[¶153] Both the Wyoming and the U.S. Constitution guarantee free speech. Just as with freedom of religion, when a government action prohibits or punishes free expression, strict scrutiny applies. In that event, the government must show that it narrowly tailored a solution to serve a compelling state interest.

[¶154] Judges subject to disciplinary claims have full protection of the First Amendment. Strict scrutiny is applied to a judge's free speech claims in circumstances like this. *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002); *Mississippi Commission on Judicial Performance v. Wilkerson,* 876 So.2d 1013 (Miss. 2004); *In re Sanders*, 955 P.2d 369 (1998). "Applying a lesser standard of scrutiny to such speech would threaten 'the exercise of rights so vital to the maintenance of democratic institutions.'" *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1665, 191 L. Ed. 2d 570 (2015).

[¶155] The *White* case provides an appropriate analysis of a judge's free speech claim in a case like Judge Neely's:

> In *Republican Party of Minnesota v. White,* Justice Scalia, writing for five members of the Court, held that [a Minnesota rule of judicial ethics prohibiting judicial candidates from "announcing" a view on any disputed legal or political issue if the issue might come before a court] violates the First Amendment. In order for the announce clause to survive strict scrutiny, it must be narrowly tailored to serve a compelling state interest. And, in order to be narrowly tailored, it must not "unnecessarily circumscrib[e] protected expression." The Minnesota rule did not meet this rigorous test. The announce clause was not narrowly tailored to promote "impartiality," in the sense of no bias for or against any party to the proceeding becaue it did not restrict speech

for or against particular parties, but rather speech for or against particular issues. If the state meant to promote "impartiality" in the sense of no preconception for or against a particular legal view, that is not a compelling state interest, the Court said, because it is both 'virtually impossible," and also not desirable, to find a judge who does not have preconceptions about the law.

Ronald D. Rotunda, *Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party of Minnesota v. White, Caperton, and Citizens United*, 64 Ark. L.Rev. 1, 36 (2011).

[¶156] The principles identified in *White* apply here. The definition of impartiality in the majority opinion leads not to true impartiality but to forced agreement with a particular idea. *White* recognizes that the impartiality pursued by the majority opinion, seeking "no preconception" against same sex marriage even on the basis of religious belief, is not a compelling state interest. The state does have a compelling interest in assuring that judges do not actually have bias against a particular party, but that is not the interest involved in this case. Judge Neely never exhibited any bias against a particular party. Furthermore, if she had any bias against a particular party, the most narrowly tailored remedy would be to find another judge to perform the wedding—exactly what Judge Neely proposed to do. Discipline against Judge Neely for her statements cannot withstand strict scrutiny as outlined in *White.*

[¶157] The majority opinion asserts that this case is distinguishable from *White* because Judge Neely did not only "announce" her position about same sex marriage, she said she would be unable to perform those marriages and would assist in finding someone who could. The majority opinion concludes that her statement goes beyond a statement and constitutes action. It is obvious, however, that all Judge Neely did was "announce" her position. Taking that position publicly is precisely what the majority opinion sanctions her for.

[¶158] The majority opinion also claims that *White* is distinguishable because "the rules she has violated are far more well established than the announce clause at issue in *White*." That certainly is not the case. Application of Rules 1.1, 1.2, 2.2 and 2.3 to situations like this is not established at all.

[¶159] The strict scrutiny/compelling state interest analysis discussed above for Judge Neely's right to free exercise of religion applies equally to her right of free speech. Although the state has compelling interests in assuring that judges follow the law and are unbiased, the evidence here does not show that Judge Neely failed to do follow the law or is biased. Interference with Judge Neely's right of free speech is not justified by any compelling state interest.

# CONCLUSION

[¶160]   There is no clear and convincing evidence that Judge Neely violated any of the rules of the Wyoming Code of Judicial Conduct.  Wyoming law does not require any judge or magistrate to perform any particular marriage, and couples seeking to be married have no right to insist on a particular official as the officiant of their wedding.  Judge Neely did not state she could "pick and choose" which law she wanted to follow, and her statements do not encourage that.

[¶161]   In our pluralistic society, the law should not be used to coerce ideological conformity.  Rather, on deeply contested moral issues, the law should "create a society in which both sides can live their own values."  Douglas Laycock, *Religious Liberty and the Culture Wars,* 2014 U. Ill. L.Rev. 839, 877 (2014).  That is precisely how Wyoming has approached the matter since its founding.

[¶162]   The *Obergefell* decision affirms this approach for the issue of same sex marriage.  It emphasized that the constitutional problem arose not from the multiplicity of good faith views about marriage, but from the enshrining of a single view into law which excluded those who did not accept it as "outlaw[s]" and "outcast[s]".  *Id.,* 135 S. Ct. at 2600, 2602.  Unfortunately, the majority opinion does just that for Judge Neely and others who share her views.  Caring, competent, respected, and impartial individuals like Judge Neely should not be excluded from full participation in the judiciary.  Judge Neely's friends who actually obtained a same sex marriage recognized this and observed that it is "obscene" to impose discipline in this case.

[¶163]   There is no cause for discipline in this case, nor for concern if Judge Neely is not disciplined or precluded from performing marriages.  Same sex couples have full access to marriage, all persons before the courts can be certain of an unbiased and impartial judiciary, and religious individuals can remain in public office even if they hold a traditional religious view of marriage.  Judicial positions are filled without either side insisting on a religious test for who may serve.  There is room enough in Wyoming for both sides to live according to their respective views of sex, marriage and religion.

[¶164]   I respectfully dissent, and would find that Judge Neely did not violate the Wyoming Code of Judicial Conduct.